**UNITED STATES of America**

**v.**

**Gary K. MOST, Jr., a/k/a Larry Blotcher, Larry Blutcher, Appellant.**

**No. 88–3111.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 1, 1989.

Decided June 2, 1989.

As Amended on Denial of Rehearing Aug. 10, 1989.

---

R. Kenneth Mundy, Washington, D.C., for appellant.

Lisa A. Kahn, Atty., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before WALD, Chief Judge, and RUTH BADER GINSBURG and BUCKLEY, Circuit Judges.

Opinion for the court filed by Chief Judge WALD.

WALD, Chief Judge:

Appellant Gary K. Most challenges his conviction for unlawful possession with intent to distribute in excess of 50 grams of cocaine, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(iii). Most contends that the district court erred in denying his motion to suppress physical evidence: drugs found in a bag which he deposited with a grocery store clerk while shopping. We conclude that the contested evidence was obtained by means of an unconstitutional search, and that its admission at trial was therefore improper. The defendant's conviction is accordingly reversed.

### I. Facts

On March 19, 1988, at approximately 5:00 p.m., three plainclothes officers of the Metropolitan Police Department observed three men in a new Lincoln Continental Town Car parked in a service roadway in the 1200 block of Kenilworth Avenue in Northeast Washington. The defendant exited the car, removed a yellow, red, and black plastic bag from the trunk, and returned to the front passenger seat. The police followed the Lincoln to a small shopping center, where the three individuals left the car. The defendant was carrying the plastic bag and, according to one officer's subsequent testimony, was looking about the parking lot in a suspicious manner. The three men entered a Chinese carry-out restaurant, emerging a short time later. The defendant, still carrying the bag, again looked around the parking lot and then entered a grocery store called Murray's Steaks.

Upon entering the grocery, Most asked one of the store clerks if she would watch his bag. The store's policy was that customers were required to check their bags while they shopped. The clerk placed the bag on the floor underneath the checkout counter. When Most completed his shopping, he took his groceries with him in a white plastic shopping bag. However, he did not retrieve the yellow, red, and black bag. Instead, he asked one of the store clerks if she would continue to watch the bag for him.

The police officers, who had been waiting outside the store, became suspicious when Most left the grocery carrying a different bag from the one which had been in his possession earlier. Two of the officers trailed Most; the third, Sergeant Byron Simms, entered the grocery in order to determine what had happened to the bag. Seeing the bag under the counter, Sgt. Simms posed as a shopper for approximately 15 minutes, watching to see whether anyone would retrieve the parcel. Sgt. Simms then questioned the store manager and the two clerks about the bag. The officer was informed that the defendant, upon leaving the store, had requested the clerks to continue to hold his bag. Both of the clerks told Sgt. Simms that they considered it strange for Most to take his groceries with him while leaving the other bag under their supervision.

Sgt. Simms then inspected the bag more closely. It was a plastic merchandise bag from an athletic shoe store called the Athlete's Foot. Sgt. Simms picked up the bag by the drawstring; looking into the bag from the top, the officer saw only a swatch

of a red garment. He pried at the top of the bag with a pen, attempting to increase the size of the opening. Sgt. Simms next felt the bottom of the bag, employing what he referred to as the "crush technique." Through the bag, Sgt. Simms could feel hard, individually wrapped packages inside; based on his experience as a narcotics officer, he concluded that these were "rocks" of the cocaine derivative crack. Upon opening the bag, the policeman discovered 272 small plastic bags, later found to contain over 300 grams of crack cocaine valued at approximately $23,000. Sgt. Simms then directed one of the other officers to bring the defendant, who had been walking around the neighborhood, back to the vicinity of the store. One of the store clerks identified Most as the man who had left the bag in their care, and he was arrested.

Prior to trial, defense counsel moved that the cocaine be deemed inadmissible as the product of an unconstitutional search. The United States argued that the bag had been abandoned and that consequently no warrant was required. The trial court, while making no express finding on the question of abandonment,[1] held that the search was lawful and denied the motion to suppress. Most was convicted and sentenced to ten years' imprisonment, plus five years' supervised probation. This appeal followed.

## II. ANALYSIS

### A. General Fourth Amendment Principles

The fourth amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. Evidence obtained by means of an unconstitutional search or seizure is not admissible at trial.

The general rule, at least in the context of a criminal investigation, is that a search must be based upon a warrant issued upon probable cause. See Skinner v. Railway Labor Executives' Association, — U.S. ——, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989) ("Except in certain well-defined circumstances, a search or seizure in [a criminal] case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause."); Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).[2] This is not to say that every warrantless search during a criminal investigation is violative of the Constitution. The relevant precedents do establish, however, that such a search is presumptively unlawful: The burden is on the government to establish that a particular exception to the warrant requirement applies.

Not every investigative technique constitutes a "search" triggering the protections of the fourth amendment. For example, a police officer does not perform a "search" when he examines objects which are already in "plain view." See, e.g., Arizona v. Hicks, 480 U.S. 321, 328, 107 S.Ct. 1149, 1154, 94 L.Ed.2d 347 (1987) ("a truly cursory inspection—one that involves merely looking at what is already exposed to view, without disturbing it—is not a 'search' for Fourth Amendment purposes"); United States v. Williams, 822 F.2d 1174, 1182 (D.C.Cir.1987) ("apprehension of that which is already in plain view of an officer lawfully present at his vantage point does not infringe any reasonable expectation of privacy, and its exposure thus is not a search

---

**1.** In our view, it could not plausibly be contended that the trial court's denial of the motion to suppress rested on an implicit finding of abandonment. Most of the facts emphasized by the district court's opinion are simply irrelevant to the question of whether the bag was abandoned. For our discussion of the government's abandonment theory, see infra pp. 196–197.

**2.** Outside the context of criminal investigations, the Court has shown an increasing willingness to assess the reasonableness of a search by means of a case-by-case balancing of individual and societal interests. See, e.g., Skinner, 109 S.Ct. at 1414; National Treasury Employees Union v. Von Raab, — U.S. ——, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989).

within the meaning of the Fourth Amendment"). The Supreme Court has also indicated that a dog sniff of luggage is not a search, for fourth amendment purposes, because the procedure "is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). In general, though, virtually any other investigative touching of a suspect's belongings will constitute a search. The Supreme Court reaffirmed this principle in *Hicks,* holding that a search had been performed when a police officer moved a piece of stereo equipment a few inches in order to inspect its serial number. The Court stressed the need for a bright line, stating that "the distinction between looking at a suspicious object in plain view and moving it even a few inches is much more than trivial for purposes of the Fourth Amendment.... A search is a search, even if it happens to disclose nothing but the bottom of a turntable." 480 U.S. at 325, 107 S.Ct. at 1153 (internal quotations omitted).

In certain very limited circumstances (*e.g., Terry* stops [3] and administrative searches) [4] the Supreme Court has held that a minimally intrusive search may be permissible under conditions that would not justify a full-scale search. In the vast majority of cases, however, the Court has refused to recognize such a middle ground. In *Hicks,* for example, the dissenters suggested that the moving of the stereo could be regarded as a "cursory inspection" which required only reasonable suspicion, not probable cause. The majority soundly rejected that argument: "We are unwilling to send police and judges into a new thicket of Fourth Amendment law, to seek a creature of uncertain description that is neither a plain-view inspection nor yet a 'full-blown

search.'" 480 U.S. at 328–29, 107 S.Ct. at 1154–55.

### B. *District Court's Analysis*

The district court's opinion suggested two possible grounds on which the police officer's actions might be justified. We believe, however, that neither provides an adequate basis for upholding the admission of the contested evidence.

#### 1. *Williams* and the "Plain Touch" Doctrine

The trial court relied in large measure on our recent decision in *Williams.* In *Williams,* officers engaged in a *Terry* stop observed one of the suspects attempting to conceal a small paper bag. Fearing that the bag might contain a weapon, one of the officers felt it with his hands. At the suppression hearing, the officer testified

> that when he touched the bag he could "feel that inside were numerous small rolled-up objects" that "felt like plastic baggies." [He] further testified that on the basis of this touching of the bag and his experience and training in narcotics detection, he "believed" that inside the paper bag were "numerous quarter bags of heroin."

822 F.2d at 1177 (citations omitted). The policeman then opened the bag and discovered heroin. We held that admission of this evidence was proper. The officer's initial touching of the bag was justified by his "well-founded concern for his own safety and that of his fellow officers at the time he took charge of the bag." *Id.* at 1180. The subsequent opening of the bag was also lawful, since "no warrant is needed for an opening of a container whose contents become known through a lawful touching of the outside." *Id.* at 1184. The court justified this "plain touch" doctrine as a corollary to the well-established princi-

---

**3.** In *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968), the Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, ... he is entitled for the protection of

himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

**4.** *See, e.g., New York v. Burger,* 482 U.S. 691, 703, 107 S.Ct. 2636, 2644, 96 L.Ed.2d 601 (1987).

ple that inspection of materials in plain view does not constitute a search governed by the fourth amendment.

■ The trial court here relied heavily on *Williams*, stating that "[b]ecause the facts in the two cases are so closely similar, *Williams* supports both the touching and the eventual opening of the bag in this case." Joint Appendix ("J.A.") 46. That conclusion cannot be sustained. *Williams* itself emphasized that

> the "plain touch" exception only applies where an officer is legally authorized to touch the container in the first place.... As in traditional plain view situations, if the officers do not lawfully occupy the vantage point from which their observations are made they cannot rely upon plain touch as justification for a search.

822 F.2d at 1184. We may assume, *arguendo*, that the "plain touch" doctrine would permit the opening of Most's bag *if* Sgt. Simms was authorized to feel the bag's exterior. "Plain touch" analysis is appropriate, however, only after the initial contact has been determined to be lawful. The doctrine applies to a narrow range of situations, such as *Terry* stops, in which police are authorized to perform a limited inspection but not to conduct a full-scale search. It does not, however, allow police officers to eviscerate the fourth amendment by performing warrantless searches one layer at a time.[5]

In relying on *Williams* to support its application of the "plain touch" doctrine, the trial court failed to distinguish between factors bearing on the permissibility of the initial contact and those bearing on the

legality of the subsequent opening. The initial touching of Most's bag was itself a warrantless search which required its own justification. *Williams* provides no support for that touching, since the factors which supported the initial contact in *Williams*—the detention of the suspects and the reasonable fear for the officers' safety [6]—are conspicuously absent in the present case.[7]

2. Probable Cause

■ The district court also stated that [f]rom the totality of the circumstances, it is clear there was probable cause for the police to act the way that they did. These circumstances include the original observance of the car, the manner in which the bag was transported by the defendant, the leaving of the bag with the clerks at Murray's at the same time the defendant took his food purchases with him upon his exiting the premises, and the experienced assessment of a veteran police officer that the bag contained narcotics after his touching the bottom of the bag.

J.A. 45. We believe that these circumstances are plainly insufficient to justify the search conducted by Sgt. Simms.

As an initial matter, we note that probable cause alone will not ordinarily justify a search. Subject to specific, narrowly defined exceptions, a judicial warrant is also required. The district court did not specify any particular exception to the warrant requirement, and it is not clear to us that any exception would apply. We need not rest

---

5. *Cf. Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion) ("the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at least emerges").

6. Although the search in *Williams* ultimately resulted in the discovery of narcotics, the reviewing court emphasized that the search was lawful only because its *purpose* was safety-related. The court stated that "if the real aim of the search was discovery or preservation of contraband rather than immobilization of weapons, the intrusion was not authorized by *Terry or Long*." 822 F.2d at 1179.

7. The government has not contended that Sgt. Simms was motivated by a fear for his own safety or that of his fellow officers, and in our view no such claim would be tenable. Sgt. Simms testified at the suppression hearing that "I had a reasonable suspicion I should say to believe by the evasive action by Mr. Most that the bag contained some type of contraband." Transcript ("Tr.") 112. Even if the officer had suspected that the bag contained a gun, the weapon would have posed no immediate threat to anyone's safety, since Most had left the store when the search occurred.

on that point, however, for in our view probable cause was clearly lacking.[8]

The district court's reference to "probable cause" was somewhat ambiguous. The court's opinion might plausibly be read to mean simply that Sgt. Simms had probable cause to open the bag once his initial touching had revealed the presence of contraband.[9] If this is what the trial court meant, then its finding was accurate but irrelevant, since the pertinent inquiry here focuses on the lawfulness of the initial touching itself. If the district court meant that Sgt. Simms had probable cause to touch the bag, then we must respectfully disagree.

Sgt. Simms himself never expressed the belief that he had probable cause to touch the bag; he stated only that he had "a reasonable suspicion ... that the bag contained some type of contraband." Tr. 112.[10] Counsel for the government has not contended, either at trial or on appeal, that the initial contact was supported by probable cause; at oral argument the government appeared to concede that probable cause was lacking. We believe that this concession was well-advised. Prior to Sgt. Simms' inspection of the package, the officers' only grounds for suspicion were their prior observation of Most "looking around and checking out the parking lot," Tr. 10, and the fact that Most had left his bag in the care of the store clerks while taking his groceries with him. Most's behavior, while to some degree unusual, hardly provided sufficiently clear indicia of ongoing criminal activity to establish probable cause for a search. The fact that the search ultimately resulted in the discovery of contraband is of course irrelevant to our analysis: the presence or absence of probable cause

must be assessed on the basis of the facts known to the officer at the time he undertook the search.

## C. The Government's Other Justifications

### 1. Abandonment

The government's principal theory, both at trial and on appeal, has been that the warrantless search in this case was constitutional because the defendant had abandoned the bag. Our cases, and those of the Supreme Court, make it clear that a warrantless search of abandoned property does not violate the fourth amendment. *See, e.g., Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *United States v. Thomas*, 864 F.2d 843 (D.C.Cir.1989); *United States v. Brady*, 842 F.2d 1313 (D.C.Cir.1988); *United States v. Brown*, 663 F.2d 229 (D.C.Cir. 1981) (en banc). We noted earlier in the term that "[t]he test for abandonment in the search and seizure context is distinct from the property law notion of abandonment: it is possible for a person to retain a property interest in an item, but nonetheless to relinquish his or her reasonable expectation of privacy in the object." *Thomas*, 864 F.2d at 845.

Abandonment may be demonstrated, for example, when a suspect leaves an object unattended in a public place. We held in *Thomas* that the defendant had abandoned a gym bag by leaving it at the top of the stairs in a public hallway. Alternatively, a "spontaneous denial of ownership, unaffected by police provocation, demonstrates sufficient intent of disassociation to prove abandonment." *Brady*, 842 F.2d at 1316. On the other hand, a person does not aban-

---

**8.** "As a general rule, probable cause to search exists when circumstances known to a police officer are such as to warrant a person of reasonable caution in the belief that a search would reveal incriminating evidence." *United States v. Thornton*, 733 F.2d 121, 127 (D.C.Cir. 1984) (internal quotations omitted).

**9.** This reading is supported by the trial court's reference to "the experienced assessment of a veteran police officer that the bag contained narcotics after his touching the bottom of the

bag," J.A. 45, as one of the "circumstances" establishing probable cause.

**10.** It is not clear from the record whether Sgt. Simms intended to use the phrase "reasonable suspicion" as a term of art. It is hardly far-fetched to suppose that Sgt. Simms, an experienced narcotics officer, would be conversant with the legal terminology used to distinguish lawful from unlawful searches. Our conclusion as to probable cause, however, does not depend on this aspect of the officer's testimony.

don his property whenever he temporarily relinquishes direct control over his belongings. As we said in *Thomas*, "[t]he law obviously does not insist that a person assertively clutch an object in order to retain the protection of the fourth amendment." 864 F.2d at 846.

 In our view, it is clear that the defendant did not abandon his bag simply by entrusting it to the care of the store clerks. Unlike the defendant in *Brady*, Most never denied ownership of the bag. To the contrary, one of the cashiers testified that Most "continuously asked me [to hold the bag] before he left the store. He actually asked me about three or four times." Tr. 128. In *Thomas*, the court noted that the defendant's ability to retrieve his bag later "would depend on the fortuity that other persons with access to the public hallway would not disturb his bag while it lay there unattended." 864 F.2d at 846 n. 5. Most, by contrast, did not place his bag within the reach of the world generally. Instead, he entrusted his belongings to the professional supervision of the cashiers with the clear understanding that they would protect the property from intrusion by the public. Although Most had departed the store when the search occurred, his brief absence [11]—preceded by a renewed request that the clerks continue to watch his bag—hardly constituted an act of abandonment.

It should also be noted that the other individuals involved in this episode did not appear to regard the defendant's bag as abandoned. One of the cashiers testified adamantly (to the evident chagrin of the government's attorney) that none of the customers could have picked up the bag because the cash register was supervised and the cashier "was watching the bag" at all times.[12] More significantly, the police officer who executed the search did not treat the bag as abandoned. He did not simply open it immediately and examine its contents, as he would have been entitled to do if the bag had been abandoned. Rather, he examined the exterior of the bag in a gingerly fashion, opening it only when the feel of hard, rocklike objects aroused his suspicions. The officer testified that, if this initial inspection had revealed nothing unusual, he would not have continued with the search. *See* Tr. 106–107. The trial judge placed great emphasis on this point, apparently in the belief that it showed the "reasonableness" of the officer's approach. *See* J.A. 45. In fact, though, this testimony undermines the government's abandonment theory: it suggests that the officer himself believed that the defendant retained an expectation of privacy in his belongings.

### 2. Reasonable Expectation of Privacy

The government's second argument, closely related to the first, is that by checking his bag with the store clerks the defendant gave up his reasonable expectation of privacy. Most surely had reason to anticipate that the clerks supervising his parcel might have occasion to move it to a more convenient spot in order to accommodate the exigencies of business. Therefore, the government argues, the defendant can hardly complain that the police, as well as the clerks, chose to touch the bag.

The government's error lies in the premise that whatever the clerks had been authorized to do could be done by the police as well. Past precedents make it clear,

---

11. Most had apparently been gone for some 15–30 minutes when the search of his bag occurred.

12. At the suppression hearing, the government's direct examination of one of the store clerks included the following exchange:

Q. And if no one was at the cash register, someone could have picked [the bag] up; could they not?
A. No.
Q. Well, why not?

A. Well, they could have, cause everybody—somebody is supposed to stay at the cash register at all times.
Q. But if no one was there, could someone have picked up the bag?
A. No, because the store was crowded, and there was a lot of stock clerks on the floor.
Q. Okay. But I'm saying assume that if no one was at the cash register, okay? Could somebody have picked it up?
A. No. Well, I was watching the bag.
Tr. 79–80.

however, that "[i]t is privacy that is protected by the Fourth Amendment, not solitude." *O'Connor v. Ortega,* 480 U.S. 709, 730, 107 S.Ct. 1492, 1505, 94 L.Ed.2d 714 (1987) (Scalia, J., concurring). The point is that an individual need not shut himself off from the world in order to retain his fourth amendment rights. He may invite his friends into his home but exclude the police; he may share his office with co-workers without consenting to an official search, *see Mancusi v. DeForte,* 392 U.S. 364, 369, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968) (individual's expectation of privacy in his office "was not fundamentally changed because DeForte shared an office with other union officers"); he may entrust his packages to private delivery personnel without giving up his expectation of privacy, *see United States v. Jacobsen,* 466 U.S. 109, 114, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable."). The mere fact that Most entrusted his bag to the care of the grocery clerks does not mean that he relinquished his expectation of privacy vis-a-vis the police.[13]

The doctrine of abandonment provides an instructive contrast. When an individual, by abandoning his property, leaves it within the reach of the public generally, there would be little point in requiring that the police alone be excluded. Such a rule would impede effective law enforcement while adding little to the individual's interest in privacy. It is quite another matter, however, to suggest that an individual forfeits his expectation of privacy simply by entrusting his possessions to one other person. The implications of the government's argument are most disturbing. In a variety of circumstances, we are all forced to surrender our possessions temporarily to the custody of others. We leave our bags with clerks at stores, museums, and restaurants; we check our luggage when we travel by train or by air; we park our cars at commercial garages. The suggestion that police in these situations may conduct warrantless searches of our belongings finds no support in precedent or in logic.

The Supreme Court's decision in *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), cited by the government, is not to the contrary. The Court in *Rawlings* held that the petitioner, having placed a large quantity of drugs in the purse of a recent acquaintance just prior to the arrival of the police, had no standing to challenge a subsequent warrantless search of the bag. The essence of the decision was that Rawlings acquired no expectation of privacy in another person's handbag by the mere act of depositing drugs therein. *Rawlings* analysis is appropriate when the inquiry focuses not on the legality or illegality of a police search, but on who is properly to be regarded as its target. Along with *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed. 2d 619 (1980), decided on the same day, *Rawlings* established that a criminal defendant may not seek the suppression of incriminating evidence on the ground that *someone else's* fourth amendment rights were violated. The obvious distinction here is that the bag searched by the officer belonged to Most himself, not to the store clerks; any intrusion that occurred was plainly suffered by the defendant.

*Rawlings* did not establish any general rule that an individual forfeits his reasonable expectation of privacy in his belongings simply by entrusting them to the care of another. Neither *Rawlings* itself nor any subsequent decision of the Court has suggested that so broad a reading is appropriate. The Court's decision in *Jacobsen,* reaffirming the principle that an individual retains a legitimate expectation of privacy

---

**13.** It is also clear that Sgt. Simms' feeling of the bag went beyond the sort of highly limited contact that would be necessary if the bag were moved from one location to another. The bag had a drawstring and could easily be transported without the physical manipulation of the bag itself in which Sgt. Simms engaged. Although Most might reasonably have expected that his bag would be moved, he had no reason to expect that it would be touched *in the way that the police officer subsequently touched it.*

in letters and packages in transit, plainly rules out such an interpretation.[14]

The defendant's expectation that the contents of his bag would remain private seems eminently reasonable in this setting. The store required, as a strict policy, that customers must check their bags with the cashier before beginning to shop. *See* Tr. 56. Moreover, it was not unusual for customers to leave their bags in the clerks' hands even after completing their shopping. One cashier testified that "[a] lot of people does that when they buy groceries, because most of them don't have a ride. And they ask us to watch it while they go catch a cab." Tr. 83. When supervision of customers' bags is part of a store's daily routine, it seems reasonable to expect that the supervision will be conscientious and professional. And when a person is *required* to surrender his bags as a condition for entry, he is surely entitled to presume that the store's employees will not take advantage of the requirement in order to gain access to his possessions.[15]

### 3. Consent

█ It is settled law that the fourth amendment does not require a warrant for a search performed with the consent of the person who is its object. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). The government appears to invoke this exception to the warrant requirement, arguing that the search occurred "only after discussions with the store manager and the cashiers, and with their cooperation and implied consent." Brief for United States at 13. Sgt. Simms' testimony, however, gives no indication that the permission of store personnel was either requested or received.[16] The government's inference of "implied consent" appears to rest upon the fact that store employees did not impede the officer's search of the bag. It is clear, however, that for constitutional purposes nonresistance may not be equated with consent.[17]

Moreover, prior decisions of this circuit furnish no support for the government's theory that the store employees could give a legally valid consent to a search of defendant's bag. This court has recognized that under some circumstances one person may consent to a police search of jointly-owned property. In all our decisions in this area, however, third-party consent has been premised on some form of common ownership or control. *See, e.g., Fludd v. United States Secret Service*, 771 F.2d 549, 553

---

14. We also note that several courts of appeals have concluded that an individual retains an expectation of privacy in the contents of luggage checked with an airline. *See, e.g., United States v. Miller*, 769 F.2d 554 (9th Cir.1985); *United States v. Armstrong*, 722 F.2d 681 (11th Cir. 1984); *United States v. Sanders*, 719 F.2d 882 (6th Cir.1983); *United States v. Waltzer*, 682 F.2d 370 (2d Cir.1982), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983); *United States v. Goldstein*, 635 F.2d 356 (5th Cir.), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981).

15. This conclusion is not undermined by the possibility that the store clerks would open the bag and examine its contents. One's fourth amendment protections within the home, after all, are not vitiated by the fact that a burglar might break into the dwelling.

16. Testifying at the suppression hearing, Sgt. Simms was asked whether he had asked anyone's permission to pick up the bag. He replied: "I spoke with the store manager, who indicated that she had no knowledge where the bag came from, and I did not ask permission from anyone else, sir. No." Tr. 112. This appears to us to be a clear acknowledgement that no permission was obtained. If the officer's reply were somehow deemed ambiguous, that ambiguity could not help the government: it is the government's burden to prove that consent was given if it seeks to invoke that exception to the warrant requirement. *See Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2045.

17. *See, e.g., Judd v. United States*, 190 F.2d 649, 651 (D.C.Cir.1951) ("Non-resistance to the orders or suggestions of the police is not infrequent in such a situation; true consent, free of fear or pressure, is not so readily to be found"); *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968) (government's burden of showing consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"); *Patzner v. Burkett*, 779 F.2d 1363, 1369 (8th Cir.1985) ("consent cannot be presumed from the absence of proof that a person resisted police authority or proof that the person merely acquiesced"); *United States v. Gonzalez*, 842 F.2d 748, 754 (5th Cir.1988) ("acquiescence cannot substitute for free consent").

(D.C.Cir.1985); *Donovan v. A.A. Beiro Construction Co., Inc.*, 746 F.2d 894, 898–902 (D.C.Cir.1984). Although this court has not expressly rejected the concept of bailee consent, that concept finds no support in circuit precedent. Our decisions in this area have their roots in the Supreme Court's decision in *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The Court there noted that

> when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.... Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, ... but rests rather on mutual use of the property by persons having joint access or control for most purposes....

415 U.S. at 171 and n. 7, 94 S.Ct. at 993 and n. 7. Plainly, no such joint control or authority was present here.[18]

### 4. Totality of the Circumstances

■ During oral argument, the government appeared to espouse a "hybrid" position based on the totality of the circumstances. The government points out that the police acted on the basis of some degree of suspicion, though without probable cause; that the bag, though perhaps not quite abandoned, was at any rate separated from the defendant's direct control; and that Sgt. Simms' touching of the bag, while concededly a search, was at least less intrusive than an indiscriminate rifling of its contents. The thrust of this line of argument is that all these factors taken together make the search "reasonable," even though no one of them could supersede the warrant requirement of the fourth amendment.

The government's argument finds no support in the relevant precedents. In fact, recent decisions look in quite the opposite direction. In *Hicks*, the Supreme Court emphasized the importance of a bright line between police conduct which is and that which is not a "search." In assessing the reasonableness of searches undertaken in the course of criminal investigations, the Court has eschewed a "balancing" approach to the warrant requirement. It has held instead that a warrantless search is presumptively unreasonable unless it fits within one of a small group of narrowly defined exceptions. Current fourth amendment jurisprudence is hardly free from ambiguity. The courts have sought, however, to provide at least a core of predictability, both to give individuals confidence that their privacy will not be violated and to furnish law enforcement personnel with workable standards to gauge the limits of their authority.[19] That predictability would be seriously undermined were we to accept the government's "hybrid" theory here.

### III. CONCLUSION

In circumstances such as these, it is fair to ask what else the police might have

---

18. Supreme Court precedents establish that a hotel night clerk cannot consent to the search of a guest's room, *see Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), and that a landlord cannot consent to the search of a tenant's house, *see Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961). More closely on point, it seems clear that employees of a private delivery service may not consent to the search of packages in transit. *See United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). We see no basis for holding that delivery people who *move* packages may not consent to a search, but that store clerks who *watch* packages may.

19. *See Oliver v. United States*, 466 U.S. 170, 181–82, 104 S.Ct. 1735, 1742–43, 80 L.Ed.2d 214 (1984) ("This Court repeatedly has acknowledged the difficulties created for courts, police, and citizens by an ad hoc, case-by-case definition of Fourth Amendment standards to be applied in differing factual circumstances. The ad hoc approach not only makes it difficult for the policeman to discern the scope of his authority; it also creates a danger that constitutional rights will be arbitrarily and inequitably enforced.") (citations omitted).

done. The most obvious answer is that the officers might—either through continued observation of the defendant's subsequent conduct or through other means, such as a dog sniff—have attempted to amass additional evidence rising to the level of probable cause.[20] Perhaps this tactic would have been successful. It is surely possible, however, that such an approach would have failed: it may well be that this evidence simply could not have been discovered by methods consonant with the fourth amendment. This possibility may be troubling, but it is scarcely anomalous; as the Supreme Court recently noted, "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Hicks,* 480 U.S. at 329, 107 S.Ct. at 1155.

We do not believe that strict enforcement of the fourth amendment will cripple the police or preclude effective law enforcement. Candor compels us to acknowledge, however, that some crimes escape detection, and some criminals escape punishment, as a result of our vigilant commitment to constitutional norms. Enforcement of these norms is not, on such occasions, a pleasant duty; but it is a duty from which judges may not shrink.

For the foregoing reasons, the defendant's conviction is

*Reversed and Remanded for proceedings consistent with this opinion.*

---

20. That evidence would have provided a predicate for the issuance of a judicial warrant. Alternatively, if exigent circumstances made compliance with the warrant requirement impracticable, a legal search could have been made based on probable cause alone. *See, e.g., Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966); *United States v. Johnson,* 802 F.2d 1459, 1461 (D.C.Cir.1986).