# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 20, 2015          Decided August 21, 2015

No. 08-3116

UNITED STATES OF AMERICA,
APPELLEE

v.

ROBERT FRANK MILLER,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cr-00143-1)

———

*Gregory Stuart Smith*, appointed by the court, argued the cause and filed the briefs for appellant.

*Stratton C. Strand*, Assistant U.S. Attorney, argued the cause for appellee.  With him on the brief were *Ronald C. Machen*, *Jr.*, U.S. Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, and *Michael K. Atkinson*, Assistant U.S. Attorneys.

Before: TATEL, SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: Appellant Robert Miller was convicted of travel fraud and wire fraud for a scheme in which he obtained funds from investors and home buyers based on false representations about how the funds would be used. On appeal, Miller raises a number of challenges to his convictions and sentence. We reject the bulk of his challenges, except that, in accordance with our usual practice, we remand his claims of ineffective assistance of trial counsel to enable the district court to consider those claims in the first instance.

I.

Beginning in July 2003, Miller operated American Funding and Investment Corporation (AFIC), a company through which he purported to offer two types of services: (i) high-yield real estate investments, and (ii) home-buying assistance for people with poor credit. First, Miller obtained cash investments from individuals who thought AFIC would invest their money in pools of investment real estate. He told those investors that AFIC would use the invested capital to buy and refurbish foreclosure properties and then resell those properties, at a profit, to home buyers with poor credit. Second, Miller obtained cash "down payments" from prospective home buyers with poor credit. He told those home buyers he would help secure mortgages for them and then would use the down payment funds to buy homes they had preselected.

As a result of those schemes, Miller obtained hundreds of thousands of dollars from prospective investors and home buyers. He never used the funds to buy any real estate for AFIC's investors, however, or to secure or fund any mortgages for prospective home buyers. He instead used the funds to pay rent for AFIC's office space, compensate

employees, buy office equipment, obtain newspaper advertisements to attract additional investors, cover personal and travel expenses, and make partial distributions to certain investors who demanded repayment.

A Secret Service investigation uncovered many details of Miller's scheme. After receiving a tip indicating that Miller had become aware of the investigation and might attempt to flee, the Secret Service arrested him at his offices. Miller was charged with nine counts of travel fraud, 18 U.S.C. § 2314, and two counts of wire fraud, 18 U.S.C. § 1343. A jury found him guilty on all counts.

II.

A.

We first consider Miller's Fourth Amendment challenge to the admission of evidence obtained by the Secret Service. In the district court, Miller sought to suppress documentary evidence obtained in a search of boxes seized from a vehicle parked at AFIC's offices. According to the parties' joint stipulation of facts, on April 8, 2004, "at [Miller's] direction, employees of AFIC placed 22 boxes of AFIC records, interspersed with what appeared to be some of Miller's personal records, in a 1995 Ford Explorer owned by and registered to Deborah Key, the mother of AFIC employee Tonya Smith." J.A. 63. Smith had "temporary use" of the Ford Explorer that day. *Id.*

After Secret Service agents arrested Miller, Smith drove the Explorer to the Secret Service Washington Field Office, where agents seized and secured the twenty-two boxes of files. The Secret Service held the boxes without immediately

searching them. The search took place only after agents obtained a search warrant, weeks later on April 27, 2004.

Miller moved to suppress the evidence contained in the boxes on the ground that it had been obtained in violation of his Fourth Amendment rights. The district court denied the motion, concluding that Miller had "fail[ed] to demonstrate an objectively legitimate expectation of privacy in the vehicle" and that he therefore lacked "standing to challenge the seizure of the boxes located in that vehicle." J.A. 179-80. Miller appeals the district court's denial of his motion to suppress, arguing that the court erred in "requiring [Miller] to establish standing in the vehicle *as well as* the boxes inside." Appellant Br. 28. According to Miller, he "had a viable privacy interest in the boxes," *id.*, which in his view sufficed to give him standing to object to the boxes' seizure.

In reviewing the district court's denial of the suppression motion, we review legal conclusions de novo and factual findings for clear error. *United States v. Holmes*, 385 F.3d 786, 789 (D.C. Cir. 2004). We will affirm the district court "so long as any reasonable view of the record supports its denial of the motion to suppress." *United States v. Patrick*, 959 F.2d 991, 997-98 n.8 (D.C. Cir. 1992).

There are three distinct events involving the evidence found in the boxes that could conceivably raise a Fourth Amendment question: (i) the search of the Ford Explorer that led to discovery of the boxes, (ii) the seizure of the twenty-two boxes from the vehicle, and (iii) the eventual search of the boxes. Miller raises no challenge to the search of the boxes. Oral Arg. Tr. 6. And for good reason: agents searched the boxes only after obtaining a search warrant. J.A. 44; Suppl. App. 436. Nor does Miller contest the validity of the search of the Ford Explorer. Oral Arg. Tr. 5. Instead, Miller

challenges only the seizure of the boxes from the vehicle. Appellant Br. 27.

Miller's argument against the seizure, however, is flawed at its foundation. His argument sounds exclusively in the *privacy* interests he ostensibly held in the boxes. He thus contends that the district court erred in examining whether he had a reasonable expectation of privacy in the Ford Explorer, when, in his view, the relevant question instead is whether he had an expectation of privacy in the boxes. His challenge to the seizure of the boxes, however, should not hinge on privacy interests at all. Rather, seizures, unlike searches, involve an interference with *possessory*—not privacy—interests. But Miller makes no argument about (or even any reference to) any possessory interests he may have had in the boxes. That is fatal to his challenge.

The Fourth Amendment protects two distinct "types of expectations," the first involving "searches" and the second involving "seizures." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The "interest protected by the Fourth Amendment injunction against unreasonable searches is quite different from that protected by its injunction against unreasonable seizures." *Arizona v. Hicks*, 480 U.S. 321, 328 (1987); *see* 1 Wayne R. LaFave, Search & Seizure § 2.1(a) (5th ed. 2014). A search "occurs when an expectation of *privacy* that society is prepared to consider reasonable is infringed." *Jacobsen*, 466 U.S. at 113 (emphasis added). A seizure, by contrast, "occurs when there is some meaningful interference with an individual's *possessory* interests in that property." *Id.* (emphasis added). It is well established that the reasonableness of a seizure turns on the nature and extent of interference with possessory, rather than privacy, interests, *e.g.*, *id.* at 124-25; and the Supreme Court has rejected the notion that "the Fourth Amendment protects against

unreasonable seizures of property only where privacy or liberty [interests are] also implicated," *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 65 (1992).

The Court accordingly has explained that subjecting luggage to a "canine sniff" does not amount to a "search" under the Fourth Amendment because it infringes no constitutionally protected privacy interest: a canine sniff "does not require opening the luggage" or "expos[ing] noncontraband items . . . otherwise . . . hidden from public view." *United States v. Place*, 462 U.S. 696, 706-07 (1983). But detaining luggage to facilitate a canine sniff "is no doubt . . . a 'seizure' . . . for purposes of the Fourth Amendment" because it "intrudes on" the owner's "possessory interest in [the] luggage." *Id.* at 707-08. Conversely, whereas recording of serial numbers on stereo equipment does not constitute a seizure because it does not "meaningfully interfere with [the owner's] possessory interest," shifting the position of the equipment to bring the serial numbers into view amounts to a search: "expos[ing] . . . concealed portions" of the equipment is an "invasion of [the owner's] privacy." *Hicks*, 480 U.S. at 324-25 (internal quotation marks omitted).

Here, although Miller consistently (and exclusively) frames his Fourth Amendment argument as one about the unlawful seizure of the twenty-two boxes from the back of the Ford Explorer, he makes no complaint of any interference with his possessory rights. Instead, he contends that the "*key* question" the district court failed to address was whether Miller had a "*privacy* interest in the boxes themselves." Appellant Br. 24, 27 (emphases added and omitted). Indeed, he invokes the term "privacy" more than fifty times in the portion of his briefing devoted to the suppression motion, but he never once makes reference to any loss of a "possessory"

interest in the boxes.  Appellant Br. 4-36; Appellant Reply Br. 4-10.

It therefore is unsurprising that, in the decision on which Miller principally relies, *United States v. Most*, 876 F.2d 191, 195-200 (D.C. Cir. 1989), this court examined whether a *search* of a defendant's bag by a police officer violated the Fourth Amendment.  In the course of finding the search unlawful, we held that the defendant had not relinquished his reasonable expectation of privacy in the bag's contents by leaving the bag with a store clerk while shopping.  *Id.* at 198-99.  *Most* is inapposite to Miller's seizure challenge.  The defendant there contested the search of the bag, not its seizure, because the police never obtained a warrant to search it.  *Id.* at 193, 195-96.  Here, by contrast, the Secret Service obtained a warrant before searching the boxes.  And Miller unsurprisingly makes no argument that the search of the boxes was unlawful.

In short, there is a basic mismatch between Miller's wholesale reliance on his *privacy* interest in the boxes and his challenge to the *seizure* of those boxes.  To the extent the seizure of those boxes violated his Fourth Amendment rights, the violation would intrude on his possessory interest in the boxes rather than on any reasonable expectation of privacy associated with them.  *See, e.g.*, *Jacobsen*, 466 U.S. at 113.  But because Miller raises no claim of interference with his possessory interests, his challenge to the seizure necessarily fails.

B.

Miller alternatively raises a second claim related to the recovery of the boxes from the Ford Explorer.  He asserts that his trial counsel rendered constitutionally ineffective

assistance by failing to call any witnesses during the hearings on Miller's suppression motion and by failing timely to submit into the record an FBI form (FBI 302) documenting an interview with Smith. According to Miller, his trial counsel's failure to put him or Smith on the stand or to enter the FBI 302 into the record deprived him of an opportunity to show that he had effective control of the Ford Explorer and thus had standing to contest its search.

To prevail on a Sixth Amendment claim of ineffective assistance of counsel, Miller first would need to show that his trial counsel's performance was deficient, falling below "an objective standard of reasonableness" as defined by "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Miller would also need to demonstrate that his counsel's deficient performance caused him prejudice—"that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Our general practice when faced with a "colorable and previously unexplored" ineffective-assistance-of-counsel claim raised for the first time on direct appeal is to remand the claim for an evidentiary hearing. *United States v. Rashad*, 331 F.3d 908, 908-10 (D.C. Cir. 2003). We will resolve such a claim without a remand only if the "trial record alone conclusively shows that the defendant either is or is not entitled to relief." *Id.* at 909-10 (internal quotation marks omitted).

Here, with respect to the first prong of the *Strickland* inquiry, the government describes various tactical considerations that may have led defense counsel to refrain from placing Smith or Miller on the stand—for instance, to avoid waiving Miller's Fifth Amendment protection, or because Smith might have been a hostile witness. The record is unclear, moreover, whether Smith planned to invoke her

own Fifth Amendment privilege to avoid testifying. We thus do not know "all the circumstances animating counsel's strategic decisions from which we could determine whether [counsel's] failure" to call the witnesses and timely submit the FBI 302 "was a reasonable, calculated choice or a mark of deficient performance." *United States v. Mohammed*, 693 F.3d 192, 204 (D.C. Cir. 2012) (internal quotation marks omitted). With respect to *Strickland*'s prejudice prong, the record does not conclusively show whether trial counsel's decision might have caused prejudice to Miller, a subject on which the district court has an "advantageous perspective." *Massaro v. United States*, 538 U.S. 500, 506 (2003). We therefore adhere to our normal practice and remand Miller's claim to the district court to examine his allegations. *See Mohammed*, 693 F.3d at 204.

II.

We next consider Miller's challenge based on the Speedy Trial Act (STA). The STA establishes a general rule: if a defendant is not brought to trial within seventy days of indictment, the court "shall" dismiss the indictment "on motion of the defendant." 18 U.S.C. § 3162(a)(2). Certain periods of pre-trial delay, however, are "excluded" when determining whether the seventy-day period elapsed. *Id.* § 3161(h). In the event of an STA violation, the district court retains discretion to determine "whether to dismiss the case with or without prejudice" based on three statutory factors. *Id.* § 3162(a)(2). In the case of a dismissal without prejudice, the government has six months from the date of dismissal to secure the return of a new indictment. *Id.* § 3288.

Here, Miller argues that the non-excludable period of time between his arraignment and his trial exceeded the statutory seventy-day limit. The Act, however, establishes

that "[f]ailure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal." *Id.* § 3162(a)(2). Miller never sought a dismissal on STA grounds before the district court. Any STA challenge he might bring on appeal therefore is waived, and plain error review is unavailable. *See United States v. Taplet*, 776 F.3d 875, 879-81 (D.C. Cir. 2015).

Unable to obtain relief on appeal directly under the STA, Miller raises the STA through the lens of an ineffective-assistance-of-counsel claim. He argues that his trial counsel rendered constitutionally ineffective assistance by failing to move for dismissal in the district court under the STA. We again follow our ordinary practice and remand that claim for initial examination by the district court.

With respect to the performance prong of the *Strickland* inquiry, Miller argues that his counsel's failure to seek dismissal necessarily amounted to deficient performance because Miller had a statutory entitlement to dismissal under the Act. Even if more than seventy non-excludable days elapsed, however, that would still not amount to a *per se* showing of deficient performance. *See United States v. Richardson*, 167 F.3d 621, 626 (D.C. Cir. 1999). Counsel might have had "sound strategic reasons for not pursuing the violation," based, for instance, on the complexity of the case or a reasonable belief that any dismissal would have been without prejudice. *Id.*; *see United States v. Rushin*, 642 F.3d 1299, 1307-08 (10th Cir. 2011).

With respect to *Strickland*'s prejudice prong, there would be a threshold question whether, in the event of a successful STA objection, the case would have been dismissed with or without prejudice. The Act provides that, "[i]n determining

whether to dismiss [a] case with or without prejudice, the court shall consider, among others, each of the following factors: [i] the seriousness of the offense; [ii] the facts and circumstances of the case which led to the dismissal; and [iii] the impact of a reprosecution on the administration of this chapter and on the administration of justice." 18 U.S.C. § 3162(a)(2). Because it is generally for a district court to determine in the first instance whether to dismiss with prejudice, *see United States v. Bryant*, 523 F.3d 349, 361 (D.C. Cir. 2008), and because the record does not conclusively establish the appropriate outcome in this case, we remand for consideration of the § 3162(a)(2) factors.

If the district court determines that the case would have been dismissed with prejudice, Miller will have satisfied *Strickland*'s prejudice prong. But if the court concludes that it would have dismissed without prejudice, thus leaving room for a retrial, the court will need to assess the implications of such a dismissal under *Strickland*'s prejudice standard. The parties dispute whether the prospect of a dismissal without prejudice would itself demonstrate *Strickland* prejudice. We have previously noted that issue without resolving it. *See United States v. Marshall*, 669 F.3d 288, 295 (D.C. Cir. 2011). There is no occasion for us to resolve that question here when it is undetermined whether Miller has a meritorious argument under *Strickland*'s performance prong, or whether, for purposes of the prejudice prong, a dismissal under the STA would in fact have been without prejudice.

III.

Miller argues that the district court improperly allowed testimony of two prospective home buyers, Charlene Peters and Anthony Wilburn, and of AFIC's director of mortgage banking, Deadrid Brown. Peters and Wilburn testified that

Miller induced them to make "down payments" in exchange for mortgages and homes that never materialized. Brown testified that Miller refused to return Peters's money even when it became clear that those funds would not be used to purchase a home. We review the district court's decision to allow testimony for abuse of discretion. *United States v. Williams*, 212 F.3d 1305, 1308 (D.C. Cir. 2000).

Miller first contends that, because the eleven counts in the indictment pertained to real-estate investment transactions, not mortgage transactions, Peters's and Wilburn's testimony about their mortgage transactions should have been deemed irrelevant under Federal Rule of Evidence 401. Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and if the "fact is of consequence in determining the action." Fed. R. Evid. 401. Here, although each of the individual counts against Miller involved an investment transaction, rather than a mortgage transaction, those counts represented specific instances of a charged scheme "to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises," including obtaining "moneys, funds and property from investors *and prospective home buyers*." J.A. 31-32 (emphasis added). Because Peters's and Wilburn's testimony as prospective home buyers pertained to aspects of the fraudulent scheme with which Miller was charged, the testimony met Rule 401's relevance standard.

Miller next argues that the same testimony amounted to inadmissible character evidence under Rule 404(b), which bars the introduction of evidence of a "crime, wrong, or other act" to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). According to Miller, the

government improperly attempted to show that, because Miller defrauded Peters and Wilburn, he must also have defrauded the victims of the eleven specific counts charged in the indictment. Miller misapprehends the scope of Rule 404(b). The Rule does not bar "evidence . . . of an act that is part of the charged offense," *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000), as was the case with Peters's and Wilburn's testimony.

Miller next contends that the testimony of Peters, Wilburn, and Brown should have been excluded as unfairly prejudicial under Federal Rule of Evidence 403. Peters and Brown, for example, both wept on the stand and testified that Peters had been left homeless with a sick baby after Miller failed to provide the home and mortgage he had promised her. Under Rule 403, the district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. In this case, the evidence in question was directly probative of Miller's fraudulent intent in carrying out the charged scheme, showing that the mortgage side of AFIC's business was a sham. And when, as here, the "evidence indicates a close relationship to the event charged," a district court acts within its discretion by striking the Rule 403 "balance . . . in favor of admission." *United States v. Clarke*, 24 F.3d 257, 266 (D.C. Cir. 1994).

For those reasons, we find no abuse of discretion in the district court's decision to allow the challenged testimony.

IV.

Miller challenges the propriety of two aspects of the government's closing argument. He first argues that the prosecution engaged in "race-baiting" when referring to

Brown's trial testimony. Brown testified about a brochure, entitled "Company Profile," which Miller had given Brown to persuade her to join AFIC. Brown said that she had underlined a particular sentence in the brochure stating that "AFIC [was] targeting primarily African American Families as its biggest market." Suppl. App. 498. When asked why she had underlined that statement, Brown responded that, when she "read" the statement, "I just thought that [Miller] was on the same page as I was basically," *i.e.*, that Miller "was out there to help people, not hurt people." *Id.* at 1014. In summarizing Brown's testimony in closing arguments, the prosecution stated that Brown "noted in AFIC's marketing materials the statement that AFIC is targeting primarily African-American families as its biggest market. Now, she thought at the time that Mr. Miller like herself was trying to help African-American families, trying to help them get into homes, not trying to hurt them." *Id.* at 1147-49.

Miller notes that the "Constitution prohibits racially biased prosecutorial arguments." *McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987). The statements in the prosecution's closing argument to which Miller points, however, do not qualify as "racially biased." The prohibition on racially biased comments addresses "comments beyond the pale of legally acceptable modes of proof." *United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir. 1990). Here, the prosecution's statements about Brown's testimony amounted to a summary of that testimony, *i.e.*, of "proper evidence introduced during trial." *See United States v. Perholtz*, 842 F.2d 343, 360 (D.C. Cir. 1988) (internal quotation marks omitted). While the statement referred to "African-American families," it did so via a recapitulation of Brown's own testimony highlighting that very phrase as it appeared in an AFIC brochure. Such a recapitulation does not constitute the sort of "racially inflammatory remark[]" or "[a]ppeal[] to

racial passion" that would implicate the prohibition against racially biased arguments by the prosecution. *Doe*, 903 F.2d at 24-25.

Miller also takes issue with several references by the prosecution to him as a "con artist" or "con man." While a prosecutor may draw "reasonable inferences from the evidence," *United States v. Allen*, 960 F.2d 1055, 1059 (D.C. Cir. 1992), she may not express her "personal opinion concerning the guilt of the accused," *United States v. Young*, 470 U.S. 1, 18 (1985). A "con man" is someone "who defrauds a victim by first gaining the victim's confidence and then, through trickery, obtaining money or property." Black's Law Dictionary (10th ed. 2014). Each time the prosecutor referred to Miller as a "con artist" or "con man," it was part of a broader discussion of evidence showing that Miller engaged in a scheme to defraud his victims by winning their confidence. *See* J.A. 237-42; Suppl. App. 1174-75, 1177, 1181. Consequently, the "words were not used as free-floating . . . expressions of the prosecutor's opinion." *United States v. Gartmon*, 146 F.3d 1015, 1024 (D.C. Cir. 1998). Instead, the references to "con artist" and "con man" were permissibly "tied to specific conduct at issue in the trial" and used as a "description of the manner in which [Miller] conducted the scheme charged in the indictment." *Id.*

V.

Finally, Miller challenges his sentence, contending that the district court failed to make an individualized determination supporting a federal sentence consecutive to (rather than concurrent with) his existing Maryland state sentence. The Sentencing Guidelines in effect at the time of Miller's conduct and sentencing provided that a "sentence . . . may be imposed to run concurrently, partially concurrently, or

consecutively to the prior [sentence] to achieve a reasonable punishment for the instant offense." U.S.S.G. § 5G1.3(c) (2008). Miller takes issue with the district court's expression of its "adhere[nce] as a general proposition to the principle, separate crime, separate time." Suppl. App. 1222.

While there might be cause for concern if the district court had limited its analysis to that kind of general approach, the court here went on to exercise case-specific discretion in imposing a consecutive sentence. The court expressly noted its "discretion to sentence concurrently or consecutively" and its "willing[ness] to listen to arguments as to why [the sentence] shouldn't be consecutive." *Id.* After considering the duration and indeterminate nature of the Maryland sentence as well as the statutory sentencing factors, the court found lacking "any fact or circumstances or even legal arguments that would warrant a concurrent sentence." *Id.* at 1248-49.

This case is thus unlike the unpublished Second Circuit decision on which Miller relies. *See United States v. Brown*, 152 F. App'x 55 (2d Cir. 2005). There, the district court exercised no case-specific discretion and imposed a consecutive sentence based solely on a "personal attitude" and preference for consecutive sentences. *Id.* at 57. Here, by contrast, the district court considered individualized factors in assigning a consecutive sentence.

Nor are the facts here akin to those in *United States v. Ayers*, __ F.3d __, 2015 WL 4590290 (D.C. Cir. July 31, 2015), decided after briefing and oral argument in this case. In *Ayers*, we held that the district court erred when it construed the relevant sentencing statute to impose a statutory presumption of consecutive sentences and thereby to *limit* the trial court's discretion to determine the timing of sentences.

*Id.* at \*3-4; *see* 18 U.S.C. § 3584(a). By contrast, the district court in this case, as noted, understood that it had full discretion; and while it expressed a general sentiment (based on experience) about the exercise of that discretion, it made the required, individualized determination under the defendant's case-specific circumstances.

\* \* \* \* \*

We remand for further proceedings on Miller's claims that his trial counsel provided ineffective assistance by failing to offer certain testimony and evidence to establish Fourth Amendment standing and by failing to move for dismissal under the Speedy Trial Act. We otherwise reject Miller's challenges to his convictions and sentence, including a number of passing suggestions of ineffective assistance of counsel mentioned only in footnotes or conclusory statements in Miller's briefing. *See* Appellant Br. 45 n.16, 47 n.19, 52, 53 n.23. Those passing references, which contain no discussion of the relevant law, are "not enough to raise [those] issue[s] for our review." *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007); *see Ry. Labor Executives' Ass'n v. U.S. R.R. Ret. Bd.*, 749 F.2d 856, 859 n.6 (D.C. Cir. 1984).

*So ordered.*