# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 2, 2020          Decided July 1, 2022

No. 19-3045

UNITED STATES OF AMERICA,
APPELLEE

v.

MANUEL D. REYNOSO,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cr-00253-1)

*Nathan S. Mammen*, appointed by the court, argued the cause for appellant. With him on the briefs was *Stephen C. DeSalvo*, appointed by the court. *William H. Burgess*, appointed by the court, entered an appearance.

*David B. Goodhand*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Elizabeth Trosman* and *John P. Mannarino*, Assistant U.S. Attorneys.

Before: SRINIVASAN, *Chief Judge*, RAO, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: A jury convicted Manuel Reynoso on a gun-possession charge and two drug charges. On appeal, Reynoso challenges his convictions on several grounds.

His most substantial claim concerns the gun-possession charge. Federal law bars certain categories of people, including those previously convicted of a felony (i.e., a crime punishable by more than one year of imprisonment), from possessing a firearm. Under the prevailing interpretation of the felon-in-possession statute at the time of Reynoso's trial, the government had to prove that he knowingly possessed a gun and that he had a prior conviction carrying the requisite maximum sentence, but not that he *knew* his prior conviction allowed for that sentence. The jury in Reynoso's case thus had no reason to consider whether he was aware that his prior convictions were punishable by more than a year in prison.

On the same day the district court sentenced Reynoso, however, the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019). *Rehaif* established that the felon-in-possession statute requires the government to show not only that the defendant knew he possessed a gun but also that he knew he had previously been convicted of a crime punishable by more than a year of imprisonment. Reynoso now contends that his felon-in-possession conviction must be overturned due to the government's failure to make the additional showing *Rehaif* requires. Because Reynoso did not raise that argument in the district court, we review his claim for only plain error.

After we heard oral argument in this case, the Supreme Court granted review in another case to consider when a person may be entitled to plain-error relief on appeal in a case involving a *Rehaif* error. *See Greer v. United States*, 141 S. Ct.

2090 (2021). Because the Supreme Court's decision in *Greer* would dictate the proper handling of appeals like this one, we held this case in abeyance pending the Court's decision. After the Court decided *Greer*, we asked the parties to submit supplemental briefs addressing *Greer*'s implications for our disposition of this case.

*Greer* held that *Rehaif* errors at trial normally will not qualify as plain errors of a kind warranting relief in appeals from felon-in-possession convictions. The Court reasoned that "[i]f a person is a felon, he ordinarily knows he is a felon," such that requiring proof that he knew of his felon status usually would not have affected the outcome of his trial. *Id.* at 2097. In accordance with *Greer*, we conclude that the district court's *Rehaif* error in this case did not amount to plain error. We also reject Reynoso's other challenges to his convictions, and we thus affirm the judgment of the district court.

I.

Before discussing Reynoso's possession of contraband, we begin with his possession of a BMW. Although Reynoso's girlfriend owned the car, he was its primary driver and thought of it as his own. In early May 2018, Reynoso drove the BMW from the District of Columbia to West Virginia, where a rapper he represented as a music promoter was filming a video. Valle Rodriguez, an associate of another artist in the video, drove Reynoso's car between the sites where they filmed the video. When they finished shooting the final scene, Reynoso retrieved the keys and drove his car back to D.C.

In a later interview with law-enforcement agents, Rodriguez would explain that, while he was in the BMW, he placed a Glock .40-caliber semi-automatic pistol under the driver's seat and an extended magazine under the front

passenger's seat. According to Rodriguez, he left the gun in the car without telling Reynoso.

Approximately one week later, a little after 1:00 a.m. on May 16, 2018, a Secret Service officer pulled over the BMW on Seventeenth Street NW near Constitution Avenue in the District of Columbia. Reynoso had been driving with his headlights off. When the officer approached the car, he smelled marijuana. He saw Reynoso in the driver's seat, with one passenger in the front and one in the back. The officer asked about the smell. Reynoso denied that anyone in the car had been smoking but immediately showed the officer a rolled dollar bill containing a marijuana bud. He indicated that was the only marijuana in the car.

Additional Secret Service officers arrived and began removing the two passengers. Reynoso stepped out of the car without being asked. Then he fled, sprinting toward the National Mall. Eventually, officers apprehended Reynoso near the Tidal Basin. He was carrying $2,890 in cash, two cellphones, a set of keys, and a small amount of methamphetamine.

Back at the car, a technician from the Secret Service's crime scene unit arrived to perform a search of the vehicle. When she looked at the floor mat under the driver's seat, she noticed it "was not fully flat." Feb. 12, 2019 Trial Tr. 210:5–6, J.A. 613. She lifted the mat, revealing a black Glock semi-automatic pistol with an extended magazine containing twenty rounds of .40-caliber ammunition.

The government charged Reynoso with possession of a firearm by a person who had been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g), and with simple possession of

methamphetamine and marijuana, in violation of 21 U.S.C. § 844(a). In support of the felon-in-possession charge, the government presented evidence of two prior convictions.

First, in 2011, Reynoso pleaded guilty in the Circuit Court for the City of Norfolk, Virginia, to distribution or possession with intent to distribute ecstasy and marijuana. The maximum punishment for each count was imprisonment for ten years or more. Reynoso was sentenced to two five-year terms, to run consecutively, but with all but ten months suspended.

Second, in February 2018, just three months before the events giving rise to the present prosecution, Reynoso pleaded guilty in Maryland to possession with intent to distribute marijuana and possession of a firearm "with a conviction of an enumerated or a disqualifying crime." Gov. Ex. 48, J.A. 100–01. The facts of that case mirror those of this one. A police officer found Reynoso in the driver's seat of a parked BMW and smelled the strong odor of marijuana. A search of the car recovered 133 grams of marijuana and a loaded Glock semi-automatic pistol.

At trial in this case, Reynoso testified that he had "no idea" there was "any sort of firearm or ammunition" beneath the BMW's floor mat. Feb. 13, 2019 Trial Tr. 58:23–24, J.A. 741. He explained that Rodriguez had hidden the gun under the seat without his knowledge. Pursuant to a stipulation, the jury was informed that Rodriguez told law enforcement he had placed his gun under the driver's seat of Reynoso's BMW and an extended magazine under the passenger seat. And, pursuant to another stipulation, Reynoso acknowledged he had previously been convicted of a crime punishable by more than one year of incarceration.

At the conclusion of the five-day trial, the jury found Reynoso guilty on each count. The district court sentenced him to seven years and three months of imprisonment on the gun-possession charge and one year on each of the drug-possession charges (with all three sentences to run concurrently).

Reynoso timely appealed. Among other claims, he argues that his gun-possession conviction should be reversed under *Rehaif* because the district court failed to instruct the jury that knowledge of felon status is an element of the crime. After we heard argument, the Supreme Court granted certiorari in *Greer* to decide when a district court's error under *Rehaif* would constitute plain error requiring reversal. We held the proceedings in this case in abeyance pending the Supreme Court's decision, and then received supplemental briefing addressing the implications of *Greer* for this appeal.

II.

A.

Reynoso's first challenge relates solely to his felon-in-possession conviction under § 922(g). He contends that the evidence was insufficient to support the jury's conclusion that he possessed the gun found under the floor mat of the BMW.

Our review is highly deferential to the jury's decision. "When assessing the sufficiency of the evidence, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Boyd*, 803 F.3d 690, 692 (D.C. Cir. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We draw no distinctions between direct and circumstantial evidence, and we give "full play to the right of the jury to

determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Clark*, 184 F.3d 858, 863 (D.C. Cir. 1999) (citation and quotation marks omitted).

"Criminal possession of a firearm may be either actual or constructive." *United States v. Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003). Actual possession requires "direct physical control." *Henderson v. United States*, 575 U.S. 622, 626 (2015). Because the gun in this case was found under the driver's floor mat, this case presents a question of constructive possession. And for constructive possession, the government must show that "the defendant knew of, and was in a position to exercise dominion and control over, the contraband." *United States v. Byfield*, 928 F.2d 1163, 1166 (D.C. Cir. 1991). "A successful conviction, then, includes proof of a physical element (dominion and control over the actual weapons) as well as a mental element (knowing possession)." *United States v. Cassell*, 292 F.3d 788, 793 (D.C. Cir. 2002).

In assessing constructive possession, we have emphasized that "mere proximity," while indicative of physical capacity to exercise control, is insufficiently probative of the mental element. *See, e.g.*, *United States v. Moore*, 104 F.3d 377, 381 (D.C. Cir. 1997). Finding constructive possession based on proximity alone might permit "unwitting roommates or housemates" to be convicted of a serious crime. *United States v. Harris*, 515 F.3d 1307, 1310 (D.C. Cir. 2008). We thus must ask "whether there is 'some action, some word, or some conduct that links the individual to the [contraband] and indicates that he had some stake in [it], some power over [it].'" *Byfield*, 928 F.2d at 1166 (quoting *United States v. Pardo*, 636 F.2d 535, 549 (D.C. Cir. 1980)).

The evidence here readily sufficed for a reasonable juror to conclude that Reynoso constructively possessed the gun.

First, the location of the gun satisfied the physical element of constructive possession. Officers discovered the weapon under the driver's floor mat of the BMW. Reynoso was the car's primary driver and considered himself to be its owner (although his girlfriend technically held the title). At the time of the traffic stop, Reynoso sat in the driver's seat, with the gun inches from his feet. We have held the driver of a car to "a higher level of accountability for the vehicle's contents." *United States v. Walker*, 545 F.3d 1081, 1088 (D.C. Cir. 2008) (quoting *United States v. Gibbs*, 904 F.2d 52, 57 (D.C. Cir. 1990)) (brackets omitted). And a presumption of control is especially warranted when the contraband is found under the driver's own seat.

Reynoso contests the mental element of constructive possession by pointing the finger at Rodriguez. But even accepting that Rodriguez initially stashed the gun in the BMW without telling Reynoso, the jury still heard evidence indicating Reynoso knew about the gun at the time of the traffic stop. After returning from West Virginia, Reynoso had been driving the BMW for a week with the gun under his feet. And the jury heard testimony that the gun created a "bulge" beneath the floor mat. Feb. 12, 2019 Trial Tr. 274:21–23, J.A. 677. A pistol with an extended magazine is hard, angular, and large. It strains credulity to suggest that Reynoso could have stepped in and out of the car, or operated the pedals, without feeling the gun beneath his shoes.

What's more, Rodriguez said in his interview that he put the gun under the driver's seat and the extended magazine under the passenger's seat. But the responding officers found the gun loaded. The natural inference is that Reynoso found the gun and the magazine, loaded the magazine into the gun, and returned the assembled weapon to its hiding place for future use. Given that circumstantial evidence of control, our

case differs from ones Reynoso cites that involved contraband found in shared spaces—under the passenger seat of a car the defendant was driving or in a bedroom the defendant split with roommates. *See United States v. Hishaw*, 235 F.3d 565, 571–73 (10th Cir. 2000); *United States v. Taylor*, 113 F.3d 1136, 1145–46 (10th Cir. 1997). For those reasons, the evidence at trial was sufficient to show that Reynoso possessed the gun.

## B.

Reynoso's next two challenges stem from the Supreme Court's decision in *Rehaif*. At the time of trial, the prevailing interpretation of § 922(g) required the government to prove that the defendant knew he possessed a gun but not that he knew about the circumstances making his gun possession unlawful. The district court thus did not instruct the jury that it needed to find Reynoso knew he had been convicted of an offense punishable by more than one year in prison, and the jury accordingly made no such finding. But in *Rehaif*, the Court held that the government must prove "that the defendant knew he possessed a firearm and also that he knew he had the relevant status when he possessed it." 139 S. Ct. at 2194.

Reynoso first contends that the jury lacked sufficient evidence to convict him on the omitted knowledge-of-status element. He further claims that the district court's erroneous jury instructions leaving out that element constituted plain error requiring reversal. We conclude that the first kind of claim is unavailable in the circumstances of this case: if the jury, consistent with then-prevailing law, is never asked to find the existence of something later established to be an offense element, there is no freestanding insufficiency-of-the-evidence claim as to that element. The sole question here, then, is whether Reynoso has shown that the failure to instruct the jury requires a retrial. As to that issue, we determine that Reynoso,

who made no objection to the improper jury instruction in the district court, has failed to show plain error warranting reversal. The record indicates he must have known his prior convictions were punishable by more than one year in prison.

1.

Reynoso attempts to cast the district court's instructional error under *Rehaif* as an insufficiency-of-the-evidence error, but that type of claim is unavailable here. In a sufficiency challenge, the defendant typically asserts that, despite the jury's finding of guilt, the government failed to present enough evidence to prove the elements of the crime beyond a reasonable doubt. In other words, the government failed to meet its burden of proof. A successful sufficiency challenge results in outright acquittal, not retrial, because "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v. United States*, 437 U.S. 1, 11 (1978).

But a defendant cannot make out a sufficiency challenge as to offense elements that the government had no requirement to prove at trial under then-prevailing law. No participant in Reynoso's trial—neither the trial judge, the prosecution, the jury, nor Reynoso himself—recognized knowledge of felon status as an element the government needed to prove. In that situation, a sufficiency claim is a non sequitur.

As the Ninth Circuit has explained, "[w]e do not examine the sufficiency of evidence of an element that the Government was not required to prove under the law of our circuit at the time of trial because the Government had no reason to introduce such evidence in the first place." *United States v. Kim*, 65 F.3d 123, 126–27 (9th Cir. 1995). In those

circumstances, insufficiency of the evidence is not "the correct way to conceive of" the error. *United States v. Johnson*, 979 F.3d 632, 636 (9th Cir. 2020). Rather, the challenge is "properly understood as a claim of trial error" in failing to instruct the jury on the omitted element. *Id.* at 637; *see also United States v. Gonzalez*, 93 F.3d 311, 323 (7th Cir. 1996).

To be sure, some courts have considered similar claims nominally under the sufficiency-of-the-evidence banner, but those courts do not apply the bar against retrial normally associated with a successful sufficiency challenge. *See, e.g.*, *United States v. Wacker*, 72 F.3d 1453, 1462–65 (10th Cir. 1995), *modified* (Mar. 11, 1996). By holding that the Double Jeopardy Clause permits reprosecution when "a conviction is reversed solely for failure to produce evidence that was not theretofore generally understood to be essential to prove the crime," *id.* at 1465 (citation omitted), those courts recognize that such claims are not standard challenges to the sufficiency of the evidence. In substance, then, those courts review the claims as though they were procedural challenges to the jury instructions, not challenges to the sufficiency of the evidence.

We join the Ninth Circuit in holding that sufficiency challenges are unavailable in this context. Rather, the relevant trial error in this case was the omission of an element of the crime from the jury instructions. We turn to that error now.

2.

Unlike his sufficiency challenge, Reynoso's challenge to the jury instructions is conceptually sound. On the merits, however, he is not entitled to relief on that claim.

At trial, Reynoso made no objection to the district court's failure to instruct the jury on the knowledge-of-status element

of the felon-in-possession offense.  But we may correct a "plain error that affects substantial rights . . . even though it was not brought to the [district] court's attention."  Fed. R. Crim. P. 52(b).  To qualify for relief on plain-error grounds, the defendant must meet three threshold requirements.  *United States v. Olano*, 507 U.S. 725, 732 (1993).  First, the defendant must identify an error "that has not been intentionally relinquished or abandoned."  *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018) (citation omitted).  Second, the error must be plain, which means "clear or obvious."  *Id.* (citation omitted).  And third, the error must affect the defendant's "substantial rights," which generally means the court must find "a reasonable probability that, but for the error, the outcome of the proceeding would have been different."  *Id.* at 1904–05 (citation and quotation marks omitted).

Even if those three conditions are met, Rule 52(b) remains permissive, not mandatory.  At the fourth prong of plain-error analysis, the defendant must persuade the court that the identified error is one that demands correction.  The Supreme Court has directed that "the court of appeals should exercise its discretion to correct the forfeited error if the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'"  *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (quoting *Olano*, 507 U.S. at 736).

The defendant "has the burden of establishing each of the four requirements for plain error relief."  *Greer*, 141 S. Ct. at 2097.  In his opening brief, Reynoso argued that the district court had committed plain error by failing to instruct the jury on the knowledge-of-status element.  But he made no effort to demonstrate that he lacked knowledge of his felon status.  For its part, the government in its initial brief asked us to sustain Reynoso's conviction at the fourth step of the plain-error analysis but made no argument as to the first three prongs.

After that briefing (and after oral argument), the Supreme Court decided *Greer*. The Court held that *Rehaif* errors in felon-in-possession cases ordinarily will not justify plain-error relief because proof that the defendant was a felon will usually also suffice to show that he knew he was a felon. *Greer*, 141 S. Ct. at 2097. Because a person with prior felony convictions "ordinarily knows he is a felon," the jury "will usually find that a defendant *knew* he was a felon based on the fact that he *was* a felon." *Id.* In short, "[f]elony status is simply not the kind of thing that one forgets." *Id.* (citation and quotation marks omitted). A defendant thus faces an "uphill climb" to show that a failure to instruct the jury on the knowledge-of-status element affected his substantial rights at the third prong of plain-error analysis. *Id.* So long as the defendant is a felon, it will be "difficult" to show a "reasonable probability" that the trial would have come out differently with proper jury instructions. *Id.*

Of course, difficult is not impossible. As the Supreme Court recognized, in certain cases a defendant might show on appeal that he could have presented evidence at trial demonstrating his unawareness of his felon status at the time of his charged firearm possession. *Id.* But absent such a showing, "the appellate court will have no reason to believe that the defendant would have presented such evidence to a jury, and thus no basis to conclude that there is a 'reasonable probability' that the outcome would have been different absent the *Rehaif* error." *Id.*

After the Supreme Court issued its decision in *Greer*, we ordered supplemental briefing. Rather than simply address *Greer*'s implications for their existing positions, the parties took the opportunity to present brand new arguments. Reynoso argues for the first time that he could have presented evidence

at trial showing his ignorance of his felon status when he possessed the gun. As for the government, it now contends that Reynoso's claim fails at the third prong of plain-error analysis, after previously resting its argument on the fourth prong alone.

Regardless of whether we address the parties' arguments raised for the first time in the supplemental briefs or instead deem them forfeited, *Greer* forecloses Reynoso's challenge to the faulty jury instructions. At trial, Reynoso stipulated that he had previously been convicted of offenses punishable by more than one year in prison. His opening brief never suggests that he could have presented evidence that he lacked knowledge of his felon status. And under *Greer*, "a *Rehaif* error is not a basis for plain-error relief unless the defendant first makes a sufficient argument or representation on appeal that he would have presented evidence at trial that he did not in fact know he was a felon." *Id.* at 2100.

Reynoso seeks to cure that deficiency by attaching various documents associated with his prior convictions to his supplemental brief. But even if we consider those records, they demonstrate that he must have known he had been convicted of offenses punishable by more than a year of imprisonment.

In 2011, Reynoso pleaded guilty to possession with intent to distribute ecstasy and marijuana in Virginia state court. He now submits documents showing that all but ten months of his two five-year sentences was suspended, such that he served less than one year in prison even if he was sentenced to more. But the clear language of § 922(g) covers anyone convicted of "a crime *punishable by* imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1) (emphasis added). The relevant inquiry is thus whether Reynoso knew that the maximum penalty for his crimes was more than one year of imprisonment. And the documents on which he relies show his knowledge of

that fact. He signed a plea agreement stating he had been sentenced to five years on each count, and he also initialed an "advice to defendants pleading guilty" form listing the maximum penalties for his charges as forty years for possession with intent to distribute ecstasy and ten years for possession with intent to distribute marijuana. Reynoso therefore knew that he could be—and in fact was—sentenced to more than a year of imprisonment.

Reynoso's 2018 conviction in Maryland further confirms his knowledge of his felon status. In that case, he pleaded guilty to possession with intent to distribute marijuana and possession of a firearm with a conviction of an enumerated or a disqualifying crime. During the plea colloquy, the prosecutor explained that he would seek a ten-year sentence, with all but one year suspended. That indicated to Reynoso that his conviction was for an offense punishable by a sentence of more than a year. In addition, Reynoso's counsel represented that he had discussed the elements of the gun-possession offense with his client. One of those elements was Reynoso's felony conviction in Virginia. The plea colloquy thus reminded Reynoso of his felon status just a few months before the Secret Service pulled him over with a pistol under the floor mat of his BMW.

Reynoso's claim of plain error, as the government contends in its supplemental brief, fails at the third prong of the analysis. The record plainly indicates that Reynoso knew he was a felon at the time he was found with a gun. The trial court's *Rehaif* error therefore did not affect Reynoso's substantial rights. Rather, the overwhelming probability is that his trial would have come out the same way had the jury instructions included the knowledge-of-status element.

Even if we were to hold the government to its initial argument relying solely on the fourth prong of the plain-error test, we would still decline to grant Reynoso relief.  The district court's *Rehaif* error does not undermine the "fairness, integrity or public reputation of judicial proceedings."  *Molina-Martinez*, 578 U.S. at 194 (quoting *Olano*, 507 U.S. at 736).  Reynoso stipulated to his felon status at trial.  And, in most cases, felon status is itself probative of knowledge of felon status, as the Supreme Court recognized in *Greer*.  141 S. Ct. at 2097–98.  Reynoso gives us no reason to think that his case is an exception.  On the contrary, his own evidence suggests he knew he was a felon.  He thus cannot show that the proceedings were fundamentally unfair.

C.

Reynoso raises several claims relating to his Sixth Amendment right to call Valle Rodriguez as a witness at trial.  Reynoso, however, waived any such right by entering a stipulation setting forth Rodriguez's statements to investigators in lieu of seeking to present his live testimony.  Reynoso therefore cannot assert error in connection with any denial of access to Rodriguez's live testimony.

1.

Before trial, Reynoso notified the district court that he intended to call Rodriguez as a witness.  Reynoso informed the government that Rodriguez would testify to his ownership of the gun and to Reynoso's ignorance of the gun's presence in the BMW.  Soon after, the government sent law enforcement agents to interview Rodriguez.  Based on that conversation, the government informed Reynoso that Rodriguez might seek to avoid testifying by asserting his Fifth Amendment privilege against self-incrimination.

At Reynoso's request, the district court appointed counsel for Rodriguez so he could pursue immunity in connection with his testimony. After some back and forth, the government indicated it did not intend to grant Rodriguez limited-use immunity for the purpose of testifying at Reynoso's trial. The court encouraged the government to reconsider, explaining that a hearing might otherwise be necessary to address whether Rodriguez had waived his privilege by talking to the government's agents. The court also recommended that the parties consider a stipulation detailing Rodriguez's account of events for the jury, which would "resolve" the outstanding issues about whether he had waived his Fifth Amendment rights. Feb. 8, 2019 Status Conf. Tr. 21:7, J.A. 166.

The parties gathered before the second day of trial to follow up on the waiver question. Reynoso's counsel announced that he had subpoenaed Rodriguez, who would testify later that day. That came as news to Rodriguez's counsel, who asked for an opportunity to speak with Rodriguez because she understood that he intended to assert his Fifth Amendment privilege. The parties proceeded to debate whether Rodriguez had waived his ability to assert the privilege by voluntarily speaking to investigators.

Before ruling on the question of waiver, the district court again asked whether the parties had considered a stipulation. Reynoso's counsel indicated he would be "glad to reach" a stipulation if it included certain specified facts. Feb. 13, 2019 Trial Tr. 27:13, J.A. 710. After a brief recess, the parties returned with a stipulation in principle, including the information Reynoso's counsel had identified. The court stated that it was "glad to hear that that has been resolved with the stipulation." *Id.* at 35:17–18, J.A. 718. Following the parties' agreement, Rodriguez's counsel asked if Rodriguez could be

excused, and Reynoso's counsel confirmed that would be "fine with the defense." *Id.* at 37:18, J.A. 720. Reynoso was present during the exchange.

2.

Reynoso identifies a host of alleged errors in the district court's handling of whether to compel Rodriguez's testimony, all of which he contends violated his Sixth Amendment right to "compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. His claims all hit the same stumbling block: Reynoso's trial counsel waived Reynoso's Sixth Amendment right to have Rodriguez testify.

"Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *Olano*, 507 U.S. at 733 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). The government contends that Reynoso's counsel waived the compulsory-process right when he stipulated to Rodriguez's written testimony. To assess that contention, we must first examine whether the right is waivable, and, if so, whether waiver can be accomplished by trial counsel alone, without the defendant's express agreement. *Id.*

Reynoso does not dispute that his right to call Rodriguez as a witness was waivable. Nor could he. The compulsory-process provision is one piece of the Sixth Amendment's "compact statement of the rights necessary to a full defense." *Faretta v. California*, 422 U.S. 806, 818 (1975). "[T]aken together," those Sixth Amendment rights "guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice— through the calling and interrogation of favorable witnesses,

the cross-examination of adverse witnesses, and the orderly introduction of evidence." *Id.*

Those three fair-trial rights are "supplement[ed]" by the Sixth Amendment's fourth guarantee: the right to assistance of counsel. *Id.* at 820, 829–30. The right to counsel is central to the Sixth Amendment's scheme because it provides "the means through which the other rights of the person on trial are secured." *United States v. Cronic*, 466 U.S. 648, 653 (1984). The invocation of the right to counsel thus involves a delegation of decision-making responsibility from the accused to his lawyer. "[W]hen a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." *Faretta*, 422 U.S. at 820.

The powers delegable to trial counsel include the assertion (or waiver) of the compulsory-process right. That conclusion follows from the Supreme Court's discussion of trial counsel's responsibility for effective use of the compulsory-process right in *Taylor v. Illinois*, 484 U.S. 400 (1988). There, the Supreme Court considered an Illinois trial court's decision to exclude testimony from a defense witness whom defense counsel had failed to timely identify. *Id.* at 401–02. The Court found no infringement of the defendant's right to compulsory process. *Id.* at 402.

In reaching that result, the Court distinguished between "basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client" and "tactical decision[s]" over which "the lawyer has—and must have—full authority." *Id.* at 417–18. The decision to refrain from calling witnesses fell firmly into the latter category. "Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the

lawyer's decision . . . not to put certain witnesses on the stand[.]" *Id.* at 418. Because the decision to invoke the compulsory-process right can be allocated to trial counsel, the Court found no unfairness in holding a defendant to account for his counsel's failure to assert it. The compulsory-process right, then, is waivable by trial counsel.

Even when waiver is permissible, however, courts "indulge every reasonable presumption against waiver of fundamental constitutional rights and do not presume acquiescence in the loss of fundamental rights." *United States v. David*, 511 F.2d 355, 360 n.11 (D.C. Cir. 1975) (alteration omitted) (quoting *Cross v. United States*, 325 F.2d 629, 631 (D.C. Cir. 1963)). But the waiver here was clear.

Reynoso's counsel knowingly accepted the stipulation as an alternative to the assertion of Reynoso's Sixth Amendment right to present Rodriguez's live testimony. Before agreeing to the stipulation, the parties, as explained, were at loggerheads over whether Rodriguez could be forced to testify. "The accused's right to compulsory process . . . does not include the right to compel a witness to waive his fifth amendment privilege." *United States v. Thornton*, 733 F.2d 121, 125 (D.C. Cir. 1984). Reynoso's access to Rodriguez's testimony thus turned on whether Rodriguez had already waived his privilege by voluntarily speaking with law enforcement.

Rather than decide that thorny issue, the district court presented the possibility of a stipulation, which would eliminate the risk of infringing either Reynoso's right to call Rodriguez as a witness or Rodriguez's right to avoid testifying. Reynoso's counsel said he would be "glad" to pursue a stipulation including the key facts he sought to present to the jury. Feb. 13, 2019 Trial Tr. 27:13, J.A. 710. And, after the parties nailed down the specifics, Reynoso's counsel consented

to Rodriguez's departure. By signaling that the stipulation had obviated any need for Rodriguez to testify, counsel waived Reynoso's Sixth Amendment right to compulsory process.

At least in theory, a defendant could stipulate to written testimony while still preserving an objection to that approach. (Of course, the government might refuse to enter a stipulation if the defendant maintained an objection.) But Reynoso's counsel failed to indicate any such objection—either when agreeing to the stipulation or when the stipulation was presented to the jury. Counsel's decision to abandon the right through the stipulation forecloses the possibility of error. We therefore reject Reynoso's compulsory-process claims.

## D.

Reynoso last contends that the government exercised an unlawful, race-based peremptory strike to remove a Black juror from the jury pool. *See Batson v. Kentucky*, 476 U.S. 79 (1986). We conclude that the district court properly applied *Batson*'s framework and did not clearly err in finding an absence of discriminatory intent. *See United States v. Gooch*, 665 F.3d 1318, 1324 (D.C. Cir. 2012).

## 1.

During jury selection, the government exercised peremptory strikes against four of the five Black jurors in the pool. The first three strikes took place without objection from Reynoso's counsel. After the fourth strike, however, defense counsel objected, contending that the government lacked a race-neutral reason for it. Without being asked, the government then explained its race-neutral basis for striking each of the four Black jurors. Reynoso's counsel took no issue with the first three strikes but reiterated his objection to the

fourth. On appeal, Reynoso again objects only to the government's fourth strike of a Black juror, identified in the record as Juror 1633.

The government pointed to Juror 1633's demeanor as its reason for striking her. The prosecutor "found her to be looking down at times," which suggested she might be "somewhat disinterested." Feb. 11, 2019 Trial Tr. 219:20–22, J.A. 386. That caused the government "concern[] about her ability to maintain focus and to listen." *Id.* at 219:23–24, J.A. 386. The government acknowledged that Juror 1633 "had nothing marked" in response to the court's questions identifying potential reasons for excluding a juror. *Id.* at 220:10, J.A. 387. But that came as a "shock[]" to the government, which had observed Juror 1633 "mak[ing] facial expressions when the [district court] was reading questions." *Id.* at 222:18–21, J.A. 389. The government further observed that, despite signs prohibiting cellphone use, Juror 1633 continued to check her phone, "put[ting] it back inside" her "long shawl sweater" only when the judge "would start to talk." *Id.* at 228:19–23, J.A. 395. That led the government to doubt Juror 1633's "ability to follow instructions." *Id.* at 229:7–8, J.A. 396. Reynoso's counsel saw things differently. He had noticed nothing about Juror 1633's demeanor suggesting she was disinterested or otherwise unfit to serve.

The district court rejected the *Batson* challenge. The court acknowledged it could not "corroborate" what the government observed as to Juror 1633 because the court "didn't see anything wrong with her." *Id.* at 223:4–6, J.A. 390. But the court nevertheless denied the *Batson* challenge "given the reasons that . . . the [prosecutor] in the case observed for the particular juror," which "appear[ed] to be legitimate reasons." *Id.* at 229:13–16, J.A. 396.

23

2.

"The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (brackets and citation omitted). To assess whether a discriminatory purpose motivated a peremptory strike, courts employ the three-step framework the Supreme Court established in *Batson*. "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race." *Id.* at 476 (quotation marks, brackets, and citation omitted). If the defendant makes that showing, "the prosecution must offer a race-neutral basis for striking the juror." *Id.* at 477. Third, "in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Id.*

The questions presented in this appeal all concern the third step: the district court's determination that Reynoso failed to show purposeful discrimination. Reynoso asserts that the court erred at that final step of the framework in three ways. First, he contends that the court erred as a matter of law by failing to consider its own observations of the juror's demeanor. Second, he argues that the court erred by failing to make sufficient factual findings to permit meaningful review. And third, he claims that the court erred in concluding that the strike was not racially motivated. None of those arguments succeeds.

To start, the district court did not err as a matter of law by relying on the government's observations rather than its own. When the government offers a prospective juror's demeanor as the reason for a peremptory strike, "the judge should take into account, among other things, any observations of the juror that the judge was able to make during the *voir dire*." *Thaler v. Haynes*, 559 U.S. 43, 48 (2010). But, as the Supreme Court

has recognized, cases will arise in which the judge "did not observe or cannot recall the juror's demeanor." *Id.* This case is not one in which the trial judge accepted the prosecutor's version of events in the face of the judge's own conflicting observations. Rather, the court acknowledged that it did not notice Juror 1633's demeanor but credited the government's characterization of her apparent disinterest.

That is a permissible approach. Neither our decisions nor those of the Supreme Court hold that a demeanor-based explanation must be rejected as a matter of law whenever the trial judge happens to miss the conduct in question. *Id.* The district court cannot watch every prospective juror at once.

We also find that the district court created an adequate record for review. The district court elicited a sufficiently detailed explanation from the prosecutor about the specific aspects of the juror's demeanor warranting the strike. The court also gave Reynoso's counsel an opportunity to respond on the record. And the court took up the government on its offer to explain not only its strike of Juror 1633 but also its strike of three other Black jurors, even though Reynoso did not challenge the latter strikes. Finally, the district court explained its decision to deny the challenge: although the court did not observe the juror's demeanor, the prosecutor did, and the reasons given "appear[ed] to be legitimate." Feb. 11, 2019 Trial Tr. 229:16, J.A. 396. The district court's discussion on the record may have been succinct, but it left no ambiguity as to the grounds for the ruling.

Finally, the district court did not clearly err in finding a lack of intentional discrimination. On the factual question of why a prosecutor struck a particular juror, our review is deferential. The Supreme Court "has explained that the demeanor of the prosecutor exercising a challenged strike is

often 'the best evidence of discriminatory intent.'" *United States v. Moore*, 651 F.3d 30, 41 (D.C. Cir. 2011) (per curiam) (quoting *Snyder*, 552 U.S. at 477). And unlike appellate judges, who have access to only a cold record, trial judges "observe[] the prosecutor's demeanor firsthand." *Id.* For that reason, "determinations of credibility and demeanor lie peculiarly within a trial judge's province." *Snyder*, 552 U.S. at 477 (citation and quotation marks omitted).

Here, the district court credited the prosecutor's observations of Juror 1633, and we defer to the trial judge's assessment of the prosecutor's sincerity. And the record shows that the district court was justified in believing the government's explanation. The prosecutor listed in detail the aspects of Juror 1633's demeanor that raised concerns and "defended [her] use of [the] peremptory challenges without being asked to do so by the judge." *Hernandez v. New York*, 500 U.S. 352, 369 (1991) (plurality opinion). The government gave reasons for striking not only Juror 1633 but also three other Black jurors. And Reynoso's counsel recognized the government's "verifiable and legitimate explanation" for striking those three jurors. *Id.* at 370. Each of those factors is evidence of the government's sincerity in asserting its race-neutral reasons for striking Juror 1633. *Id.* We thus find no reversible error in the district court's rejection of Reynoso's *Batson* challenge.

\* \* \* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*