# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 8, 2025                    Decided August 29, 2025

No. 24-3036

UNITED STATES OF AMERICA,
APPELLEE

v.

ROWENA JOYCE SCOTT,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cr-00030-1)

———

*Stuart A. Berman*, appointed by the court, argued the cause and filed the briefs for appellant.

*Eric Hansford*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Brian P. Kelly*, and *Diane G. Lucas*, Assistant U.S. Attorneys.

Before: SRINIVASAN, *Chief Judge*, PILLARD and CHILDS, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* CHILDS.

CHILDS, *Circuit Judge*: A jury convicted Appellant Rowena Joyce Scott (Scott) of three counts of wire fraud, one count of credit card fraud, two counts of filing a false income tax return, and two counts of willful failure to file an income tax return. In turn, the district court sentenced Scott to eighteen months of imprisonment. On appeal, Scott challenges her convictions on the basis that there was insufficient evidence to support the jury's verdict and that the district court abused its discretion in denying her pre-trial motions to suppress evidence. We affirm.

**I.**

Park Southern is a 12-story, 365-unit apartment building in the District of Columbia. Park Southern Neighborhood Corporation (PSNC), a non-profit, non-member corporation, owns the apartment building. PSNC's express purpose was to make "adequate housing available to poor and underprivileged residents," enable those residents "to retain support and other related services," involve them "in the planning, development, re-development and improvement of their community," and promote "the revitalization of the Park Southern neighborhood." J.A. 2710. A resident-elected board of directors manages PSNC. In 2006, to rehabilitate its apartments, PSNC took out a loan in the amount of $3,076,641 from the District of Columbia's Department of Housing and Community Development (DHCD).[1]

On January 1, 2010, the beginning date for the conduct identified in the indictment, Scott operated as both the

---

[1] DHCD "develop[s] and manage[s] affordable housing for the District" of Columbia. J.A. 633.

president of PSNC's board and the general manager of Park Southern.[2] As PSNC's board president, Scott exercised control over the board by effectively making decisions herself, seeking board approval only occasionally(and, even then, as a rubber stamp), appointing and replacing members, and limiting their access to information. She was not entitled to compensation as board president, but had singular access to PSNC's financial records, its banking accounts, checks, and credit cards. As general manager of Park Southern, Scott reviewed prospective residents, collected security deposits, prepared units for occupancy, collected rent, paid bills, kept the building secure and clear, and made all hiring and firing decisions. For managing Park Southern, Scott received a salary of about $60,000 per year and free rent valued at $635 per month. J.A. 990–91.

During the time she served as president of the PSNC board, Scott used corporate funds to make personal purchases. She made cash withdrawals, wrote checks, and used the PSNC ATM and debit cards to, among other things, pay for personal expenses, buy clothes, robes, fur coats, shoes, spa treatments, and make car insurance payments. Of particular focus in Scott's indictment was her cash withdrawal of the following amounts from PSNC's operating account at a Wells Fargo Washington, D.C., bank branch: $4,115 on February 4, 2014; $4,210 on March 4, 2014; and $2,250 on May 5, 2014.

In December 2013 and April 2014, DHCD sent notices of default to Scott and PSNC identifying specific violations of its loan agreement with PSNC. In response to the default, DHCD exercised its authority as a debtor in May 2014 to bring in Vesta

---

[2] Although the indictment identified her as a property manager, J.A. 38, Scott was adamant that she was a general manager, and not a property manager because that designation required a license.

Management Corporation (Vesta) to serve as the property manager of Park Southern.[3] Vesta owns and operates affordable housing communities. When Vesta becomes the property manager of a building, it assumes the management and physical operation of the property and collects rent due, pays bills, maintains the property, provides security for the property, and ensures regulatory compliance. Vesta entered Park Southern with its own personnel, removed all the members of the PSNC board, including Scott, changed locks to the management and maintenance offices, and took possession of the building's records, files, documents, and computers.

On July 10, 2014, Georgette Benson, a portfolio and asset manager with DHCD, conveyed to Charlotte Reis, a special agent (SA) with the Internal Revenue Service Criminal Investigation (IRS-CI) division, that Scott was misusing Park Southern funds for personal use. As a result, SA Reis opened a criminal investigation, which led to her interviewing witnesses and subpoenaing and summoning records from PSNC and Vesta among others. Thereafter, on August 6, 2014, Vesta gave consent to search the computers at Park Southern and IRS-CI took an image—essentially making a copy—of those computers on August 12, 2014. SA Reis then applied for and was granted a search warrant for the computer imaging. On November 9, 2016, Reis and a second IRS-CI special agent interviewed Scott at her apartment. Scott spoke with the agents, reviewed documentation, and answered their questions. During the conversation, Scott admitted that she did not file tax returns for tax years 2009, 2010, 2012, and 2014. J.A. 1161–62. Scott eventually asked the agents to leave when the tone of their questions became more accusatory.

---

[3] PSNC originally hired Vesta in February 2014. However, conflict between Vesta and Scott arose when Vesta requested access to financial records. As a result, Scott terminated Vesta in March 2014.

On January 31, 2019, a federal grand jury indicted Scott for three counts of wire fraud in violation of 18 U.S.C. § 1343, two counts of filing a false income tax return in violation of 26 U.S.C. § 7206(1), two counts of willful failure to file an income tax return in violation of 26 U.S.C. § 7203, and one count of D.C. credit card fraud over $1,000 in violation of D.C. Code § 22-3223(b)(5), (d)(2). On February 3, 2023, Scott filed a motion to suppress asserting that statements she made to law enforcement officials were secured in violation of her Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). That same day, Scott also filed a motion to suppress contending that the government procured the evidence from computers at Park Southern without probable cause in violation of the Fourth Amendment. The district court denied both motions to suppress.

The criminal trial regarding the charges pending against Scott occurred in June 2023. On June 27, 2023, the jury found Scott guilty on all eight counts. J.A. 2269–71. Thereafter, on March 5, 2024, the district court sentenced Scott to a total of eighteen months of imprisonment, twenty-four months of supervised release, restitution in the amount of $201,158.04, and a $650.00 special assessment. J.A. 2556, 2558, 2561. The district court entered judgment on March 7, 2024.

Scott timely appealed. Thereafter, we appointed counsel to present arguments on behalf of Scott.[4]

**II.**

We have jurisdiction to review Scott's appeal of her judgment of conviction as a final order under 28 U.S.C. § 1291. *United States v. Barrow*, 109 F.4th 521, 525 (D.C. Cir. 2024)

---

[4] We express our gratitude to Stuart A. Berman for his service.

(observing that a "judgment of conviction [i]s a final order under 28 U.S.C. § 1291").

## III.

Scott, aided by appointed counsel, challenges her convictions and the district court's judgment on several grounds. First, Scott contends that the government's evidence is insufficient to support her wire fraud convictions because there was neither an interstate wire communication nor a communication that "furthered the fraud scheme." Appellant's Br. 27. She further contends that the government failed to prove "beyond a reasonable doubt that Scott did not act in good faith." *Id.* Scott next argues that "[t]he government also failed to prove that the D.C. Code credit card charge in Count Four extended into the applicable six-year statute of limitations period." *Id.* Additionally, as "[f]or the tax offenses," Scott opines that "the government presented insufficient evidence to support [those] convictions." *Id.* at 28. Finally, Scott asserts that "the district court erred in not suppressing Scott's oral statements to law enforcement agents and evidence seized from [the] PSNC computer[s]." *Id.*

Before analyzing the substantive issues, we address Scott's procedural contention that the municipal credit card fraud charge is barred by the statute of limitations. The government asserts that Scott forfeited this argument because she did not raise it before the district court. Scott admits she "did not raise the statute of limitations issue in the district court." Appellant's Br. 38.

"[A] statute-of-limitations defense becomes part of a case only if the defendant puts the defense in issue." *Musacchio v. United States*, 577 U.S. 237, 248 (2016). "When a defendant fails to press a limitations defense, the defense does not become

part of the case and the Government does not otherwise have the burden of proving that it filed a timely indictment." *Id.* "When a defendant does not press the defense, then, there is no error for an appellate court to correct—and certainly no plain error." *Id.* "A defendant thus cannot successfully raise the statute-of-limitations defense . . . for the first time on appeal." *Id.* Therefore, under *Musacchio*, Scott forfeited her statute of limitations challenge to her municipal fraud conviction.

Even if Scott's statute of limitations challenge were not foreclosed by *Musacchio*, it would fail plain error review. "[B]efore an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that affect[s] substantial rights." *Johnson v. United States*, 520 U.S. 461, 466 (1997). Ordinarily, "to affect the defendant's substantial rights, 'the error must have been prejudicial: It must have affected the outcome of the district court proceedings.'" *United States v. Meadows*, 867 F.3d 1305, 1317 (D.C. Cir. 2017) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). Here, the government presented evidence of many credit card transactions showing Scott's embezzlement extending well into the limitations period. J.A. 2288–89. Because extensive evidence supports the jury's conclusion that those transactions were fraudulent, any error did not affect Scott's substantial rights. We thus proceed to consider the merits of Scott's remaining arguments.

**A.**

Scott's first sufficiency challenge is to the Government's wire fraud evidence, which she contends was defective because it failed to establish (1) an interstate wire communication, (2) a communication that furthered the fraud scheme, or (3) that Scott did not act in good faith. We reject these contentions.

We review challenges "to the sufficiency of the evidence de novo." *United States v. Boyd*, 803 F.3d 690, 692 (D.C. Cir. 2015). This Court's review is "highly deferential to the jury's decision." *United States v. Reynoso*, 38 F.4th 1083, 1089 (D.C. Cir. 2022). For that reason, "[t]he standard for overturning a guilty verdict on the grounds of insufficiency of evidence is a demanding one." *United States v. Maxwell*, 920 F.2d 1028, 1035 (D.C. Cir. 1990). "A conviction should be reversed only where the evidence is such that, viewing it in the light most favorable to the government, a reasonable trier of fact could not have found guilt beyond a reasonable doubt." *Id.* Under that light, we "draw[] no distinction between direct and circumstantial evidence, and giv[e] full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Gaskins*, 690 F.3d 569, 577 (D.C. Cir. 2012) (quoting *United States v. Branham*, 515 F.3d 1268, 1273 (D.C. Cir. 2008)).

The wire fraud statute makes it a criminal offense for a person, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, [to] transmit[] or cause[] to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. For a conviction, "[w]ire fraud requires proof of (1) a scheme to defraud [to get money or property]; and (2) the use of an interstate wire communication to further the scheme." *Maxwell*, 920 F.2d at 1035. In Scott's indictment, the government charged that she devised a "scheme to defraud" for the purpose of stealing, purloining, converting, and embezzling PSNC's funds "for her own personal benefit and use." J.A. 38.

The trial record yields sufficient evidence supporting the jury's verdict finding Scott guilty of having fraudulently skimmed PSNC's funds and redirected them to herself. The government demonstrated use of interstate wire communications to process cash withdrawals from PSNC's account through the testimony of SA Reis, who testified that Scott's withdrawals required communications between a bank branch in Washington, D.C. and servers located in Shoreview, Minnesota. J.A. 1148–50. Particularly, during her testimony, Reis referred to a document received from Wells Fargo—Exhibit 120—and confirmed that the three 2014 cash withdrawals by Scott cited in the indictment were electronic interstate communications between computers in Washington, D.C. and servers in Minnesota.[5]  J.A. 1150, 3605. Moreover,

---

[5] At oral argument, Scott's counsel challenged Exhibit 120's admissibility, arguing that the first three pages of the document were not substantive evidence of an interstate wire communication and, if they were considered as such, there would be a Confrontation Clause problem under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). However, Scott did not object to the government's introduction of Exhibit 120 into evidence, J.A. 468–70, 956, and we see no plain error, *United States v. Bostick*, 791 F.3d 127, 142 (D.C. Cir. 2015) ("Because Johnson did not raise that argument in the District Court, our review is for plain error."). Here, Scott cannot show prejudice because prior to government's counsel asking Reis questions about Exhibit 120, Reis reviewed withdrawal slips that were also in evidence and testified that Scott made all three cash withdrawals from PSNC's account at a Wells Fargo Bank Branch in Washington, D.C. J.A. 1144–47. Reis then explained that the Wells Fargo computers in Washington had to communicate with computers elsewhere in the country to process the withdrawals, thereby showing the interstate nature of the communications. J.A. 1148. Only then did the government's attorney ask Reis to refer to the last page of Exhibit 120 to establish that the elsewhere location was Shoreview, Minnesota. J.A. 1150. Due to the totality of evidence from Reis' testimony, we do not reach the issue of whether the first three pages

the wire communications furthered the scheme because the withdrawal would not have occurred but for the communications confirming that the requested amounts were in PSNC's account. These communications "played a significant part in enabling [Scott] . . . to acquire dominion over" PSNC's funds, and "the success of [her] scheme depended" on the bank's wires that allowed her to withdraw the money. *United States v. Maze*, 414 U.S. 395, 401–02 (1974).

Finally, the government introduced ample evidence of Scott's lack of good faith in support of the wire fraud convictions. Despite her knowledge that Park Southern's money was meant only for Park Southern and its tenants, Scott repeatedly used its funds for her personal expenses, including spa weekends, luxury clothing, and speeding fines. J.A. 530–31, 1064–75, 1127–36, 1838–39. She also took steps to prevent discovery of her fraudulent purchases, including preventing Park Southern's bookkeeper from reviewing incriminating financial statements. J.A. 706–08, 714–15. These examples of Scott's conduct suffice to show that she was knowingly stealing from and intending to defraud Park Southern. In sum, viewing the evidence in the light most favorable to the jury's verdict, the evidence presented was sufficient to support a finding that Scott was guilty of wire fraud as charged beyond a reasonable doubt. Accordingly, we affirm Scott's convictions for three counts of wire fraud.

**B.**

Scott's second sufficiency challenge is that the Government failed to carry its burden to support the jury's

---

of the Wells Fargo exhibit were properly in evidence or otherwise present a Confrontation Clause problem.

verdict on the tax offenses, and in particular that the evidence was insufficient to prove that she "acted willfully" and did not act "in good faith." Appellant's Br. 28. Scott argues that "[t]he uncontroverted evidence was that [she] was [a] busy person, untrained in finance and accounting issues, who was far more focused on helping the residents of Park Southern than she was on personal finances or tax returns." *Id.* at 45. As a busy woman, "[s]he relied on others to prepare accurate returns and to advise her on whether she needed to file at all." *Id.*

**1.**

The government charged Scott with two counts of filing a false income tax return in violation of 26 U.S.C. § 7206(1) for underreporting her income in 2011 and 2013. Section 7206(1) mandates that it is a felony for a person to "[w]illfully make[] and subscribe[] any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1). "To sustain a conviction under 26 U.S.C. § 7206(1), the government must prove that: (1) the defendant willfully made and subscribed to a tax return; (2) the return contained a written declaration that it was made under penalties of perjury; (3) the defendant did not believe that the return was true as to every material matter; and (4) the return was false as to a material matter." *United States v. Clarke*, 562 F.3d 1158, 1163 (11th Cir. 2009). In criminal tax cases, willfulness "requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991).

The government presented evidence showing that Scott earned $100,022.73 in 2011 and $83,980.47 in 2013. J.A.

2843. It further showed that she reported only $37,115 in income for 2011, J.A. 2927, and $57,524 for 2013, J.A. 2935. In light of Scott's testimony that a PSNC board member prepared her 2011 and 2013 tax returns, J.A. 1746–47, the district court instructed the jury that "[r]eliance on a qualified tax preparer is an affirmative defense to a charge of willful filing of a false tax return, if the defendant can show that she provided the preparer with complete information and then filed the return without any reason to believe it was false," J.A. 2239.

The district court added that Scott was not guilty of evading taxes if she had a good faith belief that she paid the government all the taxes owed. Viewing the evidence in the light most favorable to the government, we find that it was sufficient to allow a reasonable jury to conclude beyond a reasonable doubt that Scott willfully filed tax returns in which she knowingly and significantly under-reported her income for tax years 2011 and 2013, and that she was aware of the falsity in her returns when she signed and subscribed them under penalties of perjury. While Scott testified that a PSNC board member prepared her returns, the jury could reasonably reject this defense. One return stated it was "self-prepared" and the other return listed no preparer, in contrast to earlier returns that did list a preparer. J.A. 2928, 2936. Accordingly, we affirm Scott's convictions for violating 26 U.S.C. § 7206(1).

**2.**

The government also charged Scott with two counts of willful failure to file an income tax return in violation of 26 U.S.C. § 7203 for her failure to file income tax returns in 2012 and 2014. It is a criminal offense under § 7203 for "[a]ny person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any

information" to fail willfully "to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations." 26 U.S.C. § 7203. To sustain a conviction for violation of § 7203, "the evidence must be sufficient to prove each of the following elements beyond a reasonable doubt: (1) [the defendant] was required to file . . . tax returns; (2) she failed to file them; and (3) her failure was willful." *United States v. McKee*, 506 F.3d 225, 244 (3d Cir. 2007). As with a violation of 26 U.S.C. § 7206(1), willfulness only requires proof of a "voluntary, intentional violation of a known legal duty." *United States v. Pomponio*, 429 U.S. 10, 12 (1976).

The government presented evidence showing that Scott earned $103,112.39 in 2012 and $36,603.78 in 2014. J.A. 2843. The government further solicited testimony establishing Scott's admission of her failure to file tax returns for those years, her awareness of the obligation to pay taxes if she made more than the applicable threshold amount, and her acknowledgement that she had previously filed tax returns from 2003 through 2008, 2011 and 2013. J.A. 1161–62, 2036. This evidence viewed in the light most favorable to the government is sufficient to allow a reasonable jury to find that Scott was aware of the requirement to file taxes and that she willfully failed to file tax returns for tax years 2012 and 2014. Accordingly, we affirm Scott's convictions for violating 26 U.S.C. § 7203.

## C.

Before trial, Scott filed two motions to suppress which she argues the district court erroneously denied. "In reviewing the district court's denial of the suppression motion[s], we review legal conclusions de novo and factual findings for clear error." *United States v. Miller*, 799 F.3d 1097, 1101 (D.C. Cir. 2015).

"We will affirm the district court 'so long as any reasonable view of the record supports its denial of the motion to suppress.'" *Id.* (quoting *United States v. Patrick*, 959 F.2d 991, 997–98 n.8 (D.C. Cir. 1992)).

**1.**

Scott argues that the district court erred in denying her motion to suppress "non-*Mirandized* statements that were custodial and involuntary." Appellant's Br. 46. In support of her argument, Scott contends that SA Reis knew Scott was the target of a government investigation. Therefore, Reis's testimony denying the purpose of the IRS-CI's visit shows that "[a] reasonable person in Scott's position would have felt, as she did for two hours, that she was not at liberty to terminate the interrogation and leave." Appellant's Br. 48–50 (citing J.A. 142–43). In this regard, Scott contends that her statements were involuntarily induced by agents who "showed up armed and unannounced; fail[ed] to contact counsel for Park Southern; and failed to disclose the existence of a criminal tax investigation or tell Scott that her oral and written statements could be used against her." *Id.* at 51.

The district court denied Scott's motion to suppress, concluding that she was not in *Miranda* "custody" and her statements were voluntary.

Law enforcement officers "are not required to administer *Miranda* warnings to everyone whom they question," but rather only when an interrogated suspect is "in custody." *United States v. Lea*, 839 F. App'x 551, 554–55 (D.C. Cir. 2020) (citations omitted). "The *Miranda* custody analysis is a two-step inquiry." *Id.* at 555. "As an 'initial step,' the court must 'ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or

she was not at liberty to terminate the interrogation and leave.'" *Id.* (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)) (internal quotation marks omitted). "If the individual would have felt free to leave, the inquiry ends; a restraint on freedom of movement is a prerequisite for *Miranda* custody." *Id.* "If, however, the individual's freedom of movement was restrained, the court 'must then ask the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *Id.* (quoting *United States v. Cooper*, 949 F.3d 744, 748 (D.C. Cir. 2020)) (internal quotation marks omitted). "If so, then the individual is 'in custody' and therefore 'entitled to the full panoply of protections prescribed by *Miranda*.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).

SA Reis testified that Scott was told that the interview was "voluntary and that she could end the interview at any time." J.A. 113. Even though Scott testified that she was not told that answering the questions was voluntary, J.A. 1702, Scott nevertheless stopped the interview when she determined that Reis' tone had become too aggressive and accusatory, J.A. 1703–04. The agents stopped the interview and left "willingly." J.A. 1703. Reviewing these circumstances de novo, we hold that Scott was not in *Miranda* custody and, thus, we affirm the district court's denial of Scott's motion to suppress her statements to IRS-CI agents.

**2.**

Scott argues that the district court erred in denying her motion to suppress evidence seized from PSNC's computers because the search warrant was defective. Specifically, she contends the warrant was defective because: (1) it contained facts irrelevant to the alleged tax crimes; (2) the affiant

accepted as true allegations from a civil complaint; (3) it contained information from a witness without establishing their credibility; and (4) it failed "to negate the very plausible possibility of data deletion, alteration, or other tampering." Appellant's Br. 52–53. Further, in Scott's view, the good-faith exception is inapplicable because the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[6] *Id.* at 54–55 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)).

The district court denied Scott's motion to suppress based on the validity of the warrant. The district court concluded that "the affidavit plainly set out probable cause," J.A. 323, and provided sufficient details about and corroboration for the account of a former employee who said that Scott had used Park Southern funds for personal expenses, *id.* at 314–20. "And if I am wrong about any of that," the district court added, the evidence still would not be subject to suppression, because "[t]he agents were acting within the scope of a valid warrant when they conducted the search and their reliance on the warrant issued by the magistrate judge was objectively reasonable." J.A. 324.

The Fourth Amendment prescribes that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "Probable cause is an objective standard to be met by applying a totality-of-the-circumstances analysis." *Johnson v. District of Columbia*, 927 F.3d 539, 547 (D.C. Cir. 2019) (quoting *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016)). "It is 'more than bare suspicion but is less than beyond

---

[6] "Under the good-faith exception to the exclusionary rule, 'evidence seized in reasonable, good-faith reliance on a search warrant' need not be excluded, even if the warrant turns out to have been unsupported by probable cause." *United States v. Griffith*, 867 F.3d 1265, 1278 (D.C. Cir. 2017) (quoting *Leon*, 468 U.S. at 905).

a reasonable doubt, and, indeed, is less than a preponderance of the evidence.'" *Id.* (quoting *Burnett*, 827 F.3d at 1114). "When assessing whether a search warrant is supported by probable cause, we ask whether the issuing judge had a 'substantial basis' for concluding that 'a search would uncover evidence of wrongdoing.'" *Griffith*, 867 F.3d at 1271 (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

The warrant to search Park Southern devices established probable cause to believe that Scott willfully failed to file tax returns. Probable cause "is less than a preponderance of the evidence." *Burnett*, 827 F.3d at 1114. When approving a search warrant, the magistrate need only determine whether "reasonable inferences" from the evidence described in the application establish a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 240. To begin, the warrant affidavit described IRS records and information submitted to the IRS by third parties suggesting that Scott had willfully failed to file her taxes for 2009–2012 in violation of 26 U.S.C. § 7203 and had made willfully false statements in a tax return in violation of 26 U.S.C. § 7206(1). J.A. 237, 250–51. It was reasonable to believe that the computers—which the affidavit stated contained Park Southern's financial and accounting records—would provide corroborating evidence of those crimes. J.A. 238, 254. Other information cited in the warrant, including statements about Scott's embezzlement and allegations of financial mismanagement, further supported probable cause of Scott's tax fraud, J.A. 249, reinforcing the inadequacy of Scott's challenges to probable cause.

First, the additional facts—such as Scott's monopolization of the common room, Park Southern's loan delinquency, and the deteriorating building conditions—cited in the warrant bear on the tax crimes by providing additional evidence that Scott

was underreporting income and using Park Southern's money for her personal benefit. J.A. 246. Second, the affidavit did not accept the allegations in the civil complaint as necessarily true: it merely cited those allegations and their corroboration by witness statements and IRS records as supportive of probable cause. J.A. 243–46. Third, and similarly, the credibility of the witness's account in the affidavit was bolstered by its consistency with allegations in other civil complaints, documents signed and submitted to the IRS, declarations signed by Scott herself, and statements by a property management company. Finally, Scott offers no reason to think any data tampering occurred, let alone any explanation why the warrant needed to negate the possibility of such tampering. In sum, these insubstantial attacks do not invalidate the issuing judge's "substantial basis" for concluding that probable cause existed. *Gates*, 462 U.S. at 236.

However, even if probable cause were absent, the evidence from PSNC's computers would be admissible because Vesta consented in writing to the search of the computers. J.A. 254, 275–76. "Consensual searches fall outside the Fourth Amendment's warrant requirement." *United States v. Lewis*, 921 F.2d 1294, 1300 (D.C. Cir. 1990). And Vesta's consent was legitimate because Vesta exercised control over the computers at the time of the search. *See United States v. Peyton*, 745 F.3d 546, 552 (D.C. Cir. 2014). Therefore, we affirm the district court's denial of Scott's motion to suppress computer evidence.

*****

For the foregoing reasons, we affirm the district court's judgment.

*So ordered.*